**Harroll KRINER, Appellant**
**(Defendant below),**

v.

**STATE of Indiana, Appellee**
**(Plaintiff below).**

No. 71S00–9704–CR–253.

Supreme Court of Indiana.

Sept. 22, 1998.

C. Kenneth Wilber, South Bend, for Appellant.

Jeffrey A. Modisett, Attorney General, Katherine Modesitt, Deputy Attorney General, Indianapolis, for Appellee.

BOEHM, Justice.

Harroll Kriner was convicted of murder and sentenced to fifty-five years imprisonment. His direct appeal presents the following issues for our review:

I. Was the evidence sufficient to support the conviction?

II. Did the trial court err in refusing Kriner's tendered jury instruction stating that absence of motive "may be considered by the jury as a circumstance favorable to the accused"?

III. Did the trial court err in denying Kriner's request for a state-funded expert on trace evidence?

We affirm.

## Factual and Procedural History

Just before 5 a.m. on Sunday, June 2, 1996, the body of security guard Larry McKinstry was discovered in the one room "guard shack" of the Sibley Foundry ("Foundry") in South Bend. Police arrived a short time later to find McKinstry dead from a single large-caliber gunshot wound to the head. There was a hole in a window near where McKinstry was sitting and a large pool of blood on the floor. McKinstry was slumped back in a chair and had a sandwich in his right hand. McKinstry's shift as night watchman began at 6 p.m. on Saturday, June 1. His girlfriend, Charnessa Johnson, testified that she spoke by telephone with McKinstry for approximately ten minutes beginning around 11:15 p.m. on Saturday. The conversation ended when McKinstry said that "some company was coming." He did not say, and Johnson did not ask, who was approaching. McKinstry told Johnson that he would call her back but he never did. When police arrived around 5:30 a.m. on Sunday, the television in the shack was on but the channel to which it was tuned had gone off the air at 1 a.m. From these factors, police inferred the time of death was likely between the 11:15 conversation between McKinstry and Johnson and 1 a.m. Concern that McKinstry might have HIV delayed the autopsy and prevented a more precise estimate of the time of death.

As explained below, the State's case rested substantially on three pieces of circumstantial evidence that pointed to Kriner as the assailant: (1) a videotape surveilling the parking lot of a nearby business placed him near the crime scene at a time when McKinstry could have been killed; (2) Kriner had access to the gun that may have been used to commit the crime and was found in bushes next to a nearby railroad track; and (3) footprints in McKinstry's blood in the guard shack were of similar size and design as prints created from a pair of shoes that were seized from Kriner.

Kriner was a laborer at the Foundry and casually knew McKinstry in that capacity. In addition to serving as a security guard, McKinstry sold crack cocaine to other employees during work hours and loaned them money at high interest rates. Kriner had both bought crack cocaine from McKinstry and occasionally borrowed money from him. Kriner was not a suspect until several days after the killing. The investigation focused on Kriner when police viewed a videotape from a private surveillance camera overlooking the parking lot of the Adult Emporium, an adult bookstore located several hundred yards from the Foundry guard shack. It captured a man that the State claimed was Kriner parking a car resembling Kriner's late-model Oldsmobile in the bookstore lot around 11:17 p.m. on Saturday. The man sat in the car for several minutes before exiting the vehicle and walking around the front of the car to the rear passenger-side door. He appeared to retrieve something from the back seat and then vanished from view, possibly by walking west towards the Foundry. At 12:16 a.m. the man reappeared wearing a different shirt. He did not appear to be carrying anything or wearing gloves. He then got in his car and drove away. Cameras that recorded activity at the cash registers inside the bookstore gave no indication that Kriner had been in the store that night. Although it was initially disputed at trial whether Kriner was the man on the videotape, Kriner conceded the point in closing arguments and does not dispute in this appeal that he was the man captured on the surveillance camera.[1]

Before obtaining the videotape, police had questioned Kriner and other Foundry employees as part of a routine effort to gather evidence and leads. Kriner was questioned again after the videotape was reviewed. In this second round of questioning at a police station, Kriner told police that he went to the Foundry guard shack around 6 p.m. on Saturday to pay McKinstry the last installment ($75) of a loan and then went home for the evening. Kriner specifically denied being at the bookstore on the night of the killing. When the interrogating officers told Kriner that the bookstore surveillance camera placed Kriner in the parking lot that evening, Kriner changed his answer to indicate that he could not remember being at the bookstore and that he had "blackouts."[2] Kriner nonetheless repeatedly denied any involvement in McKinstry's death.

On June 6—the same day that the videotape was obtained—a shotgun was recovered from bushes next to railroad tracks that ran along the east side of the Foundry. No fingerprints were found on the weapon. The State's theory was that Kriner had taken the gun from his landlord, Kevin Schultz, and used it to kill McKinstry. For the five weeks prior to the killing Kriner rented a sleeping room in an apartment building in South Bend. Schultz managed the building and lived in a house next door. He owned a hunting shotgun that he kept in his bedroom leaning against a wall near a dresser. In the week before the murder, Kriner helped Schultz move some furniture and had been in the bedroom where the gun had been in plain view. Several days after the killing, Schultz noticed that the gun, which had been purchased by a family member some twenty years earlier, was missing. A sheath in which Schultz kept the gun along with several rounds was left behind. Schultz identified the gun that was recovered from the railroad tracks as the gun missing from his bedroom. He testified that he kept his house locked and did not notice any signs of forced entry around the time that the gun was apparently

---

1. In his closing argument, defense counsel told the jury: "Mr. Kriner is on the—seen on the video at the Adult Emporium. So what. It's an adult book store. He may not have been proud that he was there.... It doesn't take 50 minutes to go kill somebody.... Fifty minutes is a lot more consistent with being in the book store than it is with going to commit a murder." On rebuttal, the State indicated that it interpreted these comments as a concession: "I guess now we can firmly say it's the defendant because [counsel] has pretty much conceded in his argument that the defendant was there...."

2. The parties do not address the possibility that Kriner may have committed the murder but not recalled the event. At some point after McKinstry's death, Kriner was discussing the killing with a co-worker at a restaurant near the Foundry. When asked if he had killed McKinstry, Kriner replied: "No. Well, I don't think I did. I would have remembered that."

taken. In the second interrogation of Kriner discussed above, a police officer testified that he asked Kriner whether Kriner had access to a weapon. Kriner replied that his landlord had a shotgun and accurately described the gun as a twelve-gauge shotgun. The officer testified that Kriner did not "admit" that he had taken the gun, but it is unclear whether Kriner denied taking it or simply was not asked.

The evidence was not clear-cut that the shotgun that was found was in fact Schultz's. Although Schultz identified the gun as his, sales records for the weapon indicated a possible discrepancy. The gun had been traced through its serial number to the Trading Post, a gun dealer in Plymouth, Indiana. The Trading Post had a record of selling the same type of weapon to Robert Schultz (Kevin's father) in December 1977, but the serial number of the weapon for that transaction (AP231272) was not the same as that for the gun that was found by the railroad tracks (AN223021). The owner of the Trading Post, Bob Kepler, testified that in 1977, when he sold a hunting shotgun to Robert Schultz, it was not uncommon for guns to be test-fired in a room in the back of the Trading Post after they had been purchased; as a result a customer could depart with the same model of gun but a different weapon (and hence a different serial number) than the sales log reflected. A Trading Post sales record for December 1977 indicated that Kepler had sold both of the guns bearing these two serial numbers on or around the same day.

The State attempted to link the gun to the crime through the testimony of an FBI firearms examiner. A Remington–Peters spent shell casing was found in the gun when it was recovered, but it was unclear what type of ammunition—buckshot or rifle slug—had been fired. The examiner testified that shotgun "wadding" found at the crime scene was "consistent with having been manufactured by Remington–Peters." Several unused

Remington–Peters shells that were left behind in Schultz's gun sheath were found to contain metal rifle slugs and the same kind of shotgun wadding ("plastic H wadding") as that recovered from the crime scene. A lead projectile found on the floor of the guard shack was so mutilated that the examiner was unable to draw any forensic conclusions from it, except that it was consistent in weight with a Remington–Peters rifle slug and, due to its weight, could not have been fired by a pistol or revolver. When pressed on cross-examination, the examiner testified that he could not even be sure that the lead fragment had been a piece of ammunition. An evidence technician who gathered evidence at the crime scene testified that the lead fragment was the remains of a deer slug.

With one possible exception depending on how the evidence was weighed, no fingerprints, hairs, or other trace evidence linked Kriner to the purported murder weapon or the crime scene. Several footprints were left in McKinstry's blood in the Foundry guard shack. After Kriner had been identified as a suspect, a search of Kriner's car uncovered a pair of Converse tennis shoes with the raised imprint "CONS" on the tread. An FBI shoe tread examiner created prints from Kriner's shoes and compared them with the prints in McKinstry's blood. The examiner testified that the two sets of prints "correspond in design and approximate size." Both sets had a similarly shaped imprint of "CONS" with the same typescript as Kriner's shoes. However, the examiner could not definitively match the two sets so as to conclude that the prints in McKinstry's blood must have come from Kriner's shoes in particular. She testified that the footprints left in McKinstry's blood did not contain sufficient identifying markers to make a more precise match.[3]

Kriner did not take the stand or offer any kind of alibi defense through the testimony of other witnesses. Rather, his explicitly stated

---

3. No blood was found anywhere on Kriner's shoes. There was no evidence one way or another as to whether the shoes had been washed or cleaned with any solvent. No blood was found in Kriner's car after testing of the driver's area and the brake and accelerator pedals. The State suggested that this might have been due to rainy conditions on the night of the killing. Rain fell in South Bend beginning around 10 p.m. on Saturday night and continued, apparently without significant interruption, almost until sunrise the next day. The bookstore videotape of the man that the State claimed was Kriner showed rainy conditions.

strategy was to pin the murder on two co-workers who testified, Edward Millunzi and Ronald Reynolds. Defense witness Leonard Roberts testified that he heard Millunzi twice boast that he had killed McKinstry. The first conversation took place shortly after the murder and outside of an apartment building in South Bend when Roberts first met Millunzi, and the second occurred when the two were cellmates in jail. According to Roberts, Millunzi described in the latter conversation how he approached the guard shack and fired the fatal shot. There was testimony that Millunzi made similar boasts to at least one other inmate. Roberts testified that he did not report the conversations to police until several months after the crime because he did not believe Millunzi. He also testified that Millunzi was drunk at the time of the first conversation outside of the apartment building. In his testimony, Millunzi denied making these boasts but admitted that he had said after the killing that "I killed [McKinstry] just as much as [Kriner] did." Millunzi explained that this statement, rather than being any confession, was directed to what Millunzi believed was a lack of evidence against Kriner. Millunzi specifically denied at trial that he was the killer. The State suggested in closing arguments that Millunzi's jailhouse statements were idle boasts and were inconsistent with some physical details of the crime.

Reynolds testified that around a month before the killing he and Millunzi, who lived together, discussed the possibility of "doing bodily injury" to McKinstry. According to Reynolds, he and Millunzi joked about robbing McKinstry because he often carried a "wad" of money. Reynolds was not explicitly asked whether he was involved in the murder.

The defense otherwise focused on the circumstantial nature of the State's case and asserted that Kriner lacked any motive to kill McKinstry. There was evidence, however, that some hostility may have existed between the two. Steven Plummer, a Foundry co-worker, testified that on the day before the killing he overheard a conversation between Kriner and McKinstry at work in which they exchanged insults and threatened each other.

Plummer described the conversation as having a "nasty" tone, and his verbatim reports support that conclusion. On cross-examination, Plummer testified that he did not view the argument to be "serious" and that arguments between McKinstry and others at the Foundry were sometimes heated and contentious. In its closing argument, the State suggested that the motive for the killing was robbery. Kriner had told police that after he gave McKinstry what Kriner described as the final $75 loan payment around 6 p.m. on Saturday, Kriner saw McKinstry put the money in the middle drawer of his desk in the guard shack. No money was found in that drawer or on McKinstry's person when police arrived on Sunday morning to investigate the homicide.

A jury convicted Kriner of murder and he appeals. This Court has jurisdiction of Kriner's appeal because the sentence exceeds fifty years imprisonment. IND. CONST. art. VII, § 4.

## I. Sufficiency of the Evidence

■ Pointing as he did at trial to the circumstantial nature of the State's case, Kriner argues that the evidence was insufficient to prove beyond a reasonable doubt that he was the killer. It is well settled that a murder conviction may be based entirely on circumstantial evidence. *See, e.g., Bradford v. State,* 675 N.E.2d 296, 299 n. 1 (Ind.1996). The question, therefore, is whether adequate circumstantial proof was presented. When a verdict rests on circumstantial evidence, the State need not overcome every reasonable hypothesis of innocence. Rather, circumstantial evidence will be deemed sufficient if inferences may reasonably be drawn that enable the trier of fact to find the defendant guilty beyond a reasonable doubt. *Saylor v. State,* 686 N.E.2d 80, 84 (Ind.1997), *petition for cert. filed* (U.S. May 1, 1998) (No. 97–8913). In this review, we do not reweigh the evidence or assess the credibility of witnesses. *Id.*

■ Although Kriner is correct that mere presence at or near the scene of the crime is insufficient to prove his involvement, *Menefee v. State,* 514 N.E.2d 1057, 1059 (Ind. 1987), far more evidence than mere presence was offered in this case. This includes: (1)

although the FBI shoe tread examiner was unable to conclude that the shoe prints in McKinstry's blood necessarily came from Kriner's shoes, the similarity (particularly the distinct "CONS" insignia on both sets of prints) was striking; (2) Kriner's presence in the nearby parking lot of the adult bookstore around the likely time of death; (3) Kriner's appearing to retrieve something from the back seat of his car before he left the parking lot and his wearing a different shirt when he returned empty handed an hour later, without any sign that he had been inside the bookstore; (4) the gun that could reasonably have been found to be the murder weapon was found abandoned nearby; and (5) Kriner's access to the gun. In addition, there was evidence supporting the conclusion that Kriner had one or more motives for committing the murder: (1) robbery, if the jury credited a police officer's testimony that Kriner said he saw McKinstry put Kriner's $75 loan payment in a desk drawer where no money was found after the killing; and (2) hostility, if the jury credited testimony by a Foundry co-worker relaying McKinstry's and Kriner's exchange of threats and insults less than forty-eight hours before McKinstry was killed. *See Hicks v. State*, 690 N.E.2d 215, 222 (Ind.1997) ("[h]ostility is a paradigmatic motive for committing a crime") (citation and internal quotation marks omitted).

■ Kriner asks us to view each piece of evidence in isolation. Circumstantial evidence by its nature is a web of facts in which no single strand may be dispositive. In a prosecution based on circumstantial proof, the evidence in the aggregate may point to guilt where individual elements of the State's case might not. *Mitchell v. State*, 541 N.E.2d 265, 268 (Ind.1989) ("[T]he combination of facts and the inferences which [the evidence] permit[s], which tie appellant to these crimes, reinforce one another and as a composite show more than mere opportunity or presence"). That is certainly true of this case. *Cf., e.g., Beecher v. State*, 567 N.E.2d 861 (Ind.Ct.App.1991) (murder convictions supported by sufficient circumstantial evidence). We conclude that the evidence viewed as a whole and most favorably to the judgment supports the finding of guilt.

## II. Jury Instruction on Absence of Motive

■ Kriner next contends that the trial court erred when it refused to give the following tendered jury instruction:

Absence of motive for committing the crime charged is in the nature of an exculpatory circumstance which a defendant on trial is entitled to establish and which may be considered by the jury as a circumstance favorable to the accused.

The State responds that the standard instruction on motive that was given—directing that "[t]he State is not required to prove a motive for the commission of the crime charged"—adequately covered the issue. The State is not correct; there is no link between the elements of the crime and whether a particular fact (lack of motive) may be relevant or how it may be weighed. It does not follow, however, that Kriner has carried the day. A number of our decisions, of both recent and older vintage, have upheld the refusal to give similar instructions dealing with the weight to be accorded absence of motive. For the reasons explained below, today's case is another in that line.

Modern Indiana authority on this subject emanates principally from *Robinson v. State*, 262 Ind. 463, 317 N.E.2d 850 (1974). In that case, the following instruction was at issue:

If upon careful examination of all the evidence, the State has failed to show any motive on the part of the accused to commit the crime charged against her, then this is a circumstance which you the jury should consider in favor of the accused in making up your verdict.

*Id.* at 467, 317 N.E.2d at 853 (internal quotation marks and citation omitted). In affirming the trial court's refusal to give this instruction, *Robinson* emphasized the well established principle that jury instructions should not single out "specific evidence or particular witnesses and comment upon the weight or consideration to be given such matters." *Id.* We held a few years later that an instruction stating that "absence of proof of motive is a powerful circumstance in favor of the accused" was properly refused because it amounted to "an unfair ju-

dicial comment upon the weight of evidence." *Reburn v. State,* 421 N.E.2d 604, 607 (Ind.1981) (not citing or discussing *Robinson*). Other post-*Robinson* decisions involving similar instructions are in accord. *See also Legue v. State,* 688 N.E.2d 408, 411 (Ind.1997) (failure to instruct jury that absence of motive "is a powerful circumstance intending to exculpate a defendant when the State's proof is entirely by circumstantial evidence" was not error); *Currin v. State,* 497 N.E.2d 1045, 1048 (Ind.1986) (following *Robinson* and declining invitation to overrule it); *Wilson v. State,* 268 Ind. 112, 119–20, 374 N.E.2d 45, 49 (1978) (citing *Robinson* in affirming refusal to instruct jury that "failure to show motive should be considered by the jury as a circumstance in favor of [the defendant's] innocence").[4]

These cases were driven by the concern that instructions speaking to the effect of absence of motive interfere with the jury's role as trier of fact. The jury is vested with a unique function in our constitutional scheme in this respect. IND. CONST. art. I, § 19 ("In all criminal cases whatever, the jury shall have the right to determine the law and the facts."). As a general proposition, jury instructions in a criminal case should lay out the legal principles and rules that are relevant to adjudicating the matter at hand, including elements of the crime, burdens of production and persuasion, and any defenses. They are not designed to suggest, even remotely, what the facts may be. Kriner's tendered instruction advised jurors that they "may" weigh lack of motive in a particular fashion as opposed to instructing that they "should" or "must" do so. Nonetheless, it singled out one circumstance and identified it as "exculpatory." As such it suffered from the same infirmity identified in *Robinson.* Defense counsel was free to argue, as he did without interference, in his opening and closing statements, that Kriner had no motive for the killing. Kriner did not object to the State's instruction and does not contend that he was barred from offering

relevant evidence showing an absence of motive or that the jury was prohibited from considering any such evidence in his favor. Thus, if the jury was so inclined, the trial framework provided ample opportunity for jurors to draw the conclusions Kriner preferred—that he lacked a motive for the killing and that this decreased the likelihood that he was the assailant. In sum, although there may be circumstances when a defense instruction on absence of motive is appropriate, in this case the trial court's rejection of the tendered instruction presents no reversible error.

### III. Failure to Appoint Trace Evidence Expert

 Finally, Kriner argues that the trial court erred in refusing his request for a state-funded expert on trace evidence. The contention is that a trace evidence expert "would have testified that the failure to find any physical evidence to connect Mr. Kriner to the murder was unlikely at best if he had been in fact the one who had committed the murder." Kriner specifically focuses on the lack of blood and glass on his shoes or in his car and maintains that an expert would have testified that the chances of this result were remote if Kriner was the killer. He offers no factual support for the proposition that an expert would have so testified and the State offers nothing to controvert it. The State replies that the trial court did not abuse its discretion because expert testimony would not have added to the testimony on trace evidence that was given. A defendant who requests funds for an expert witness must demonstrate a need for the expert. The appointment of experts for this purpose is within the trial court's discretion. *See, e.g., Williams v. State,* 669 N.E.2d 1372, 1383 (Ind.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1828, 137 L.Ed.2d 1034 (1997).

We agree with Kriner that trace evidence was an important issue in this case. The likelihood that he could have done what the

---

4. A handful of early Indiana cases between 1883 and 1944 addressed variants of the issue presented here. *See generally* D.E. Buckner, Annotation, *Necessity that Trial Court Charge Upon Motive in Homicide Case,* 71 A.L.R.2d 1025 (1960). At one time Indiana took a different view of these instructions: *Porter v. State,* 173 Ind. 694, 91 N.E. 340 (1910) held that failure to give a *Robinson*-like motive instruction was reversible error. However, *Porter* in this respect was expressly overruled by *Robinson.* 262 Ind. at 467–68, 317 N.E.2d at 853.

State alleged without leaving any trace on his shoes was a significant factual question for the jury in evaluating the State's entirely circumstantial case. However, one of the evidence technicians who investigated the crime scene testified on cross-examination that blood in the cracks of Kriner's tennis shoes would have been "very difficult" to wash away completely. The State's witness thus conceded a critical part of what Kriner argues would have been established by the expert he was denied. Kriner's contention at trial was that he could not have been the killer due to the lack of blood on his shoes and clothes or in his car. Although scientific analysis might have bolstered this claim, it was largely an appeal to jurors' common sense and experience. This cuts against the appointment of an expert on this issue. *Scott v. State*, 593 N.E.2d 198, 200 (Ind.1992) (whether expert opinion is necessary is one factor to be taken into account in deciding whether expert should be appointed); *but cf. James v. State*, 613 N.E.2d 15, 20–22 (Ind. 1993) (failure to provide defendant with blood spatter expert in a death penalty case was reversible error). Based on these considerations, the trial court could have found that Kriner did not meet his burden of showing the need for a trace evidence expert. Accordingly, there was no error.[5]

### Conclusion

The judgment of the trial court is affirmed.

SHEPARD, C.J., and DICKSON, SULLIVAN and SELBY, JJ., concur.

---

5. Kriner also maintains that the trial court erred in denying his motion to suppress the fruits of the search of his car—the Converse tennis shoes. Under settled authority, because Kriner did not object when the shoes were offered into evidence at trial, this claim is waived. *See generally* 12 ROBERT LOWELL MILLER, JR., INDIANA PRACTICE § 103.106 (2d ed. 1995 & Supp.1998).