Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 28 2013, 10:00 am

Kevin S. Smith

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MARK A. BATES**
Lake County Public Defender
Crown Point, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JAMES B. MARTIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| DONALD W. CAMPBELL, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 45A04-1109-CR-473 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Clarence D. Murray, Judge
Cause No. 45G02-0906-MR-4

**February 28, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**SHEPARD, Senior Judge**

In 2008, the Lake County Sheriff's Department received new information on a 1992 cold case. The subsequent investigation led to Donald Campbell's conviction and sentence for murder. We affirm.

FACTS AND PROCEDURAL HISTORY

Sixty-two-year-old Donna Hogue lived in the Black Oak neighborhood of Gary. After work, Donna would often have supper and play with her grandchildren at the home of one of her sons. Every night, she called each of her children before going to bed. Donna spoke with one of her daughters sometime between 9 and 9:30 p.m. on June 4, 1992.

The next morning, Donna did not show up for work. When co-worker Robert Powell stopped by her house to check on her, the inner door was slightly ajar, and upon entry he saw signs of a struggle: the house was in disarray, furniture was knocked over, and Donna's glasses were lying broken on the carpet. Powell found Donna's nude body lying face-down on a bed, with just a slipper on her foot, a doily tied around her neck, and a nightgown pulled up around her neck and arms. A knife covered with a towel was sticking out of her back. Powell called the police and notified Donna's family.

The police found a blood-stained utility knife and a pool of blood in the living room next to the front door. They found pools of blood in other areas of the living room. A coffee table was overturned with a leg broken off, and a sofa cushion was on the floor. A trail of blood led to the bedroom where Donna's body was found.

2

An autopsy revealed that Donna had suffered a wide slash wound to her neck that cut her larynx and esophagus. She had also been stabbed nine times in the back. Six of the stab wounds had been driven so deeply that they lacerated a lung.

The case remained unsolved until November 2008, when Detective Dennis Matthew Eaton of the Lake County Sheriff's Department received an anonymous phone call from a woman claiming to have information about a 1992 murder in Black Oak. She called back a few days later, identified herself as Laurie McDonald, and said that her father Donald Campbell may have been involved in Donna Hogue's murder. Campbell's sister and Donna Hogue's brother had been married at some point.

Detective Eaton reviewed reports from the coroner's office and the crime lab. After examining a list of evidence originally collected at the scene, he and Lisa Black of the Indiana State Police Laboratory resubmitted certain items for testing. They were interested in possible DNA results, something not available in 1992.

During the investigation, Detective Eaton spoke with Loretta Earl. Loretta and Campbell divorced in 1982 but continued to live together in Black Oak until Loretta left him on May 15, 1992. Detective Eaton also spoke with Campbell's nephew Ronnie Anglin and Ronnie's wife Judy Anglin; Campbell and his brother Tommy Campbell had been staying with them in Black Oak at the time of the crime.

Detective Eaton went to Campbell's home in Sullivan, Indiana, with a warrant for his DNA. When Campbell asked for more information, Detective Eaton declined to say anything about the case unless they were at a police department where the conversation could be recorded. They went to the Sullivan County Sheriff's Office, where Eaton took

buccal swab samples from Campbell and told him he was investigating Donna Hogue's murder. Campbell repeatedly denied knowing Donna Hogue.

In June 2009, the State charged Campbell with murder. After an eight-day trial, the jury found Campbell guilty. The court later sentenced him to fifty-eight years.

## ISSUES

Campbell raises multiple issues on appeal:

I. Whether the trial court wrongly admitted Loretta Earl's testimony.

II. Whether the trial court erred by admitting DNA evidence.

III. Whether the State committed prosecutorial misconduct amounting to fundamental error by misstating facts in its PowerPoint presentation.

IV. Whether the trial court erred by allowing the jury to use a transcript to aid them in listening to Campbell's interview.

V. Whether the trial court abused its discretion in instructing the jury.

VI. Whether the evidence is sufficient to sustain Campbell's conviction.

VII. Whether the trial court abused its discretion in sentencing him.

## DISCUSSION AND DECISION

### I. ADMISSION OF LORETTA'S TESTIMONY

Campbell challenges the admission of multiple statements made by Loretta. We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. *Turner v. State*, 953 N.E.2d 1039, 1045 (Ind. 2011).

At trial, Loretta referred to an argument she had with Campbell on the day she left him as "way more than an argument." Tr. p. 535. The State then asked Loretta about an argument they had a couple of days before she left him. Loretta testified that Campbell

4

"had me pinned down on the bed" and said, "One of these days I'm going to kill somebody. He said, it was going to be my fault and I would have to live with it." *Id.* at 536, 545. Campbell's motion for a mistrial was denied. When the State asked Loretta how she felt when she heard of Donna's murder, she said, "I had this sinking feeling in my gut." *Id.* at 547.

Campbell argues that the testimony that he said he was going to kill somebody was inadmissible under Indiana Evidence Rule 404(b): "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." For evidence of other crimes, wrongs, or acts to be admissible, a court must: (1) determine that the evidence is relevant to a matter at issue other than the defendant's propensity to commit the charged act and (2) balance the probative value of the evidence against its prejudicial effect pursuant to Rule 403. *Barker v. State*, 695 N.E.2d 925 (Ind. 1998).

What Campbell said to Loretta is merely a statement showing his state of mind at the time and does not fall within the ambit of Rule 404(b). *See Hicks v. State*, 690 N.E.2d 215, 221 n.11 (Ind. 1997) (evidence that defendant said he wanted murder victim dead and told someone "I just want to shoot her" showed state of mind, not prior bad acts under 404(b)).

It was within the court's discretion to determine that the probative value of Campbell's statement showing his state of mind weeks before the murder outweighed any unfair prejudice.

Campbell also argues that the court should have granted his motion for mistrial based on Loretta's testimony that their argument was "way more than an argument," that he "had [her] pinned down on the bed," and that she had a "sinking feeling in [her] gut" when she learned of Donna's murder. The trial court is in the best position to assess the circumstances of an error and its probable impact on the jury, so we review the denial of a mistrial only for an abuse of discretion. *Lucio v. State*, 907 N.E.2d 1008, 1010 (Ind. 2009). The question is whether the defendant was so prejudiced that he was placed in a position of grave peril, measured by the conduct's probable persuasive effect on the jury. *Pittman v. State*, 885 N.E.2d 1246, 1255 (Ind. 2008).

Campbell claims Loretta's "sinking feeling" statement made it clear to the jury that she believed he had killed Donna. Indiana Evidence Rule 704(b) prohibits witnesses from stating opinions as to guilt. Rule 704(b) does not, however, prohibit evidence that leads to an inference, even if no witness could state an opinion as to that inference. *Steinberg v. State*, 941 N.E.2d 515, 526 (Ind. Ct. App. 2011), *trans. denied*. Loretta did not testify that she thought Campbell killed Donna. That a jury might infer from the evidence that Loretta believed Campbell was guilty does not render the testimony inadmissible, much less mandate a mistrial. *See id.* at 525-26.

As for whether Loretta's testimony that she and Campbell had "way more than an argument" and that he "pinned" her warranted a mistrial, Campbell points to a bench colloquy that occurred after the mistrial was denied. While discussing juror questions, trial counsel said: "I want to make note [that] the first [question] says, besides pinning you down in 1992, during the course of your relationship with Donald, was he ever

6

violent with you? Did he ever hit you? Obviously the jury paid attention to the fact that she said that he pinned her down . . . ." Tr. p. 578.

Campbell did not ask the court to admonish the jury to disregard either statement. Moreover, the only testimony that clearly constitutes uncharged misconduct evidence was about Campbell "pinn[ing]" Loretta to the bed, and the court's admonishment of Loretta outside the presence of the jury suggests the statement was inadvertent:

> THE COURT: Don't add anything into your answer other than what your response is to the question. You cannot testify as to any past instances of bad conduct on the part of the defendant, things that he may have done to you in the course of an argument.
> THE WITNESS: Okay.
> THE COURT: If he hit you or held you down, you cannot testify to that.
> THE WITNESS: I'm sorry, your Honor.
> THE COURT: A few moments ago you made a comment that he held you down.
> THE WITNESS: I realized that after I did that, sir, I'm sorry.
> THE COURT: And I know that [the State] had talked to you already about what you could testify to. But I want to make certain that we don't have a situation where something is said in open court that shouldn't be said. The old saying, you can't unring the bell.
> THE WITNESS: I'll do my best, your Honor.

*Id.* at 539-40. In light of the evidence presented against Campbell, which we discuss below, we conclude that this brief, isolated statement over the course of an eight-day trial did not contribute to the jury's verdict.

## II. ADMISSION OF DNA EVIDENCE

### A. Statistical Data

On direct, Lisa Black testified that the handle of the utility knife found near the front door contained a mixed DNA profile from Donna and an unknown individual.

7

Black gave the statistical data of a match with Donna but said nothing about the profile's statistical significance as to Campbell. She did say she could not exclude Campbell as a contributor. *Id.* at 1045.

Campbell now argues that the DNA evidence regarding the utility knife was inadmissible because "Black did not offer a statistical analysis of the probability of a match for Campbell at that time." Appellant's Br. p. 15. He cites *Deloney v. State*, 938 N.E.2d 724, 730 (Ind. Ct. App. 2010), *trans. denied*, in which this Court held that DNA evidence that does not constitute a match or is not accompanied by statistical data regarding the probability of a defendant's contribution to a mixed sample is not relevant and should not be admitted.

The State responds that the claim has not been preserved for appeal, and we are inclined to think that's correct. Anyway, the record shows that Black eventually testified that the DNA tests of blood from the utility knife excluded Campbell as a contributor. Actually, the jury was told multiple times that Campbell's DNA was not found on the utility knife. Tr. pp. 1105, 1173-74, 1179. There is no fundamental error on this point.

### B. Contamination

The results of DNA testing, like any other evidence aided by expert testimony, are admissible when the court is satisfied that the scientific principles upon which the expert testimony rests are reliable, the witness is qualified, and the testimony's probative value is not substantially outweighed by the dangers of unfair prejudice. *Overstreet v. State*, 783 N.E.2d 1140, 1150 (Ind. 2003).

Campbell claims several problems compromised the integrity of the DNA evidence. Specifically, he notes Black's testimony that: (1) State's Exhibit 40, Indiana State Police ("ISP")[1] Item 5B2, was contaminated because the DNA profile matched Black; (2) State's Exhibit 40, ISP Item 5B10, was contaminated because the DNA profile matched Black's secretary; and (3) Black detected some contamination in a reagent blank, which is a control run along with an evidence sample.

Black testified that the lab keeps employee DNA profiles on file because "it is a known fact that we work with such small quantities of DNA, and it is present on so many things, that there is -- contamination does occur." Tr. p. 1174. When the hairs in State's Exhibit 40, ISP Items 5B2 and 5B10, came back as matching lab personnel, Black followed specific procedures pursuant to the lab's quality control process. *Id.* at 1168. She further testified that State's Exhibit 40 never came into contact with the key DNA evidence in this case, State's Exhibit 58, which included two hairs recovered from Donna's body exhibiting scientific matches to Campbell's DNA profile. *Id.* at 1167.

As to the contaminated reagent blank, that likewise involved State's Exhibit 40 and not Exhibit 58. *Id.* at 1134, 1173. In any event, Black ran the reagent blank multiple times. She detected contamination close to the threshold, but at other times she did not detect contamination at all. She followed protocol and received permission from her technical leader to use the data, *id.* at 1133, 1172-73, indicating that the contamination was not so severe as to undermine the scientific reliability of the results.

---

[1] Throughout the trial, the items of evidence collected at the scene were referenced by both State Exhibit and ISP numbers.

None of these issues or the others Campbell mentions in passing[2] is so substantial as to affect the admissibility of the DNA evidence. *See Smith v. State*, 702 N.E.2d 668, 673 (Ind. 1998) (irregularities in testing procedures generally go to weight of evidence and not admissibility). Black's work was approved by another analyst, who would have checked the quality of her samples and reagent blanks and confirmed her data and conclusions. Tr. pp. 1175-76. The jury was told exactly which items were contaminated and was free to weigh the evidence accordingly.

## III. PROSECUTORIAL MISCONDUCT

Campbell next contends that the State committed prosecutorial misconduct by misstating facts in its PowerPoint presentation. In reviewing such a claim, we determine whether the prosecutor engaged in misconduct, and if so, whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he would not have been otherwise subjected. *Castillo v. State*, 974 N.E.2d 458, 468 (Ind. 2012). Because Campbell failed to properly preserve his misconduct claims by requesting an admonishment or a mistrial, he must show that the misconduct rises to the level of fundamental error to avoid waiver. *See id.*

Campbell's first claim relates to slides used during Black's testimony. Black testified she phenotyped the blood on State's Exhibit 41, ISP 6, and found it consistent with Donna. The PowerPoint slide showed to the jury stated, "6A and 6B dried blood

---

[2] Campbell notes Black's testimony that she does not wear anything on her hair while she works (although she wears a lab coat, gloves, and a face mask) and that she might have placed more than one piece of evidence on the same piece of paper while working a case back in 1992.

consistent with Donna Hogue." Supp. Exs., PowerPoint Presentation 1 p. 1.[3] Black then testified she collected two samples, one stained and one unstained control:

> A    I think I only collected -- I collected one sample and then I collected an unstained control stamp [sic].
> Q    So 6A and 6B?
> A    That is correct.
> Q    Okay.  And why did you do that?
> A    That was pretty standard procedure back then, as you would collect the stain area and then collect the unsustained [sic] area to make sure there wasn't interference by the substrate.
> Q    Do you recall how much blood you saw?

Tr. p. 1024.  At this point, Campbell objected to the slide as being inconsistent with Black's testimony.  Outside the presence of the jury, the court noted the objection was valid and instructed the State to wait for the testimony before showing the slide.  *Id.* at 1027.  When the testimony continued, Black clarified that ISP Item 6A was an unstained sample and ISP Item 6B was a stained sample.  Thereafter, Black expressly distinguished between the blood stained samples and the unstained control samples with respect to State's Exhibit 42 (ISP 7), State's Exhibit 43 (ISP 8), State's Exhibit 44 (ISP 9), and State's Exhibit 60 (ISP 25).  For State's Exhibit 66 (ISP 29) and State's Exhibit 69 (ISP 30), the doily and the nightgown, Black stated that she could not obtain unstained control samples because they were entirely soaked with blood.

None of this was misconduct, fundamental or otherwise.  Black's testimony expressly clarified which samples were blood stained samples and which were unstained control samples.

---

[3] Three separately paginated PowerPoint presentations are included in the Supplemental Exhibits.  We refer to the first, used during Black's testimony, as "PowerPoint Presentation 1," the second, apparently used during the State's initial closing argument, as "PowerPoint Presentation 2," and the third, apparently used during the State's rebuttal closing argument, as "PowerPoint Presentation 3."

Campbell also argues that the State committed misconduct during closing arguments by saying and showing PowerPoint slides indicating that Campbell had said his brother Tommy was disabled. *See* Tr. pp. 1364, 1411, 1414; Supp. Exs., PowerPoint Presentation 2 p. 4, PowerPoint Presentation 3 p. 1.[4]

Generally, a prosecutor must confine closing argument to comments based upon the evidence presented in the record. *Lambert v. State*, 743 N.E.2d 719, 734 (Ind. 2001). The prosecutor may argue both law and facts and propound conclusions based upon his analysis of the evidence. *Id.*

Campbell said in his interview with Detective Eaton that Tommy had a "bad leg." Eaton asked whether Tommy had ever been involved in any violent crimes, and Campbell replied:

> Tommy ummm he's got a bad leg. I guess 2 of his feet were pulled in real bad when he was born, turned in so far. They took measurements from all over him ya know to try to straighten them and stuff. And he, he just never really they didn't fix it correctly. Nah . . . He couldn't do nothing, or nothing like that. He can't go play ball[.]

Supp. Exs., Interview Tr. p. 17. Based on this evidence, it was a fair characterization for the State to indicate that Campbell had said Tommy was disabled.

### IV. TRANSCRIPT AS AN AID

During Detective Eaton's testimony, the State had transcripts for the jury to assist them while listening to Campbell's interview. Outside the presence of the jury, Campbell

---

[4] Campbell cites the PowerPoint presentation used during the initial closing but the prosecutor's statement during rebuttal closing. We construe his claim as challenging all of the State's closing argument references to Campbell saying Tommy was disabled and cite accordingly.

objected on grounds that the transcript was inaccurate.  Before the interview was played, the court gave the jury the following admonishment:

> You are about to hear an audio tape, and also there's going to be a copy, rather a transcript passed to you, to aid you in listening to that audio tape. Now, if there are some discrepancies between what's in the audio tape and what's on the transcript, and there shouldn't be many, but there may be some, it's important that you understand that what you hear on that tape is what controls.  That's what's important, not what's on the transcript.

Tr. p. 1254.  After the interview was played, the court again admonished the jury: "And let me remind you that you have to rely on what you heard on the audio and not what's on the printed pages of the transcript."  *Id.* at 1257.

Campbell now contends that the trial court erred by allowing the jury to use the transcript.  He says that in the interview, when Detective Eaton asked if he had heard rumors about a crime committed seventeen years before, he replied, "I've done had a stroke since then, my major memory is not that good," but the transcript says, "I've done had a stroke since then so, my Major Memory is not how would I put it?"  Appellant's Br. p. 23.

We discern no prejudice, as the transcript sufficiently reflects Campbell's statement that he had had memory issues since his stroke.  We find no error.  *See Bryan v. State*, 450 N.E.2d 53, 60 (Ind. 1983) (concluding defendant failed to show prejudice from jury using transcript while listening to tape and further noting trial court admonished jury to rely on audio rather than transcript).[5]

---

[5] Campbell also asserts in a footnote that there are several omissions in the transcript that cumulatively amount to error; however, he does not specify what the omissions were or how they amount to error. *See* Appellant's Br. p. 23 n.4.  The claim is therefore waived.

## V. JURY INSTRUCTIONS

### A. Motive Instruction

At the close of trial, the State requested the instruction, "Motive is what causes a person to act. The State is not required to prove a motive for the crime charged." Tr. p. 1429 (Final Instruction 8). Campbell, noting there was evidence the house had been ransacked, saw no special reason for the instruction and stated, "I didn't think they would be left wondering why this happened, given the condition of the home." *Id.* at 1341. The court gave the instruction over Campbell's objection.

Instructing the jury lies within the sole discretion of the trial court, and we will not reverse for an abuse of that discretion unless the instructions as a whole mislead the jury as to the law in the case. *Carter v. State*, 766 N.E.2d 377 (Ind. 2002).

Campbell says the motive instruction is "contradictory and confusing," Appellant's App. p. 25, and points to the intent instruction given by the court: "A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so. If a person is charged with intentionally causing a result by his conduct, it must have been his purpose not only to engage in the conduct, but also to cause the result." *Id.* at 1427 (Final Instruction 6). He then says the motive instruction "appears to be confusing and would relieve the jury of having to find that Campbell acted intentionally before he could be convicted of murder." Appellant's Br. p. 26.

We disagree. First, we note that the motive instruction here is a pattern jury instruction. *See* 2 Ind. Judges Ass'n, Ind. Pattern Jury Instructions—Criminal 12.27 (Supp. 2003) (Matthew Bender). Second, although Campbell appears to suggest that the

14

terms "motive" and "intent" are conflated by the instructions, we conclude the opposite. The jury was essentially informed that if it believed Campbell intentionally killed Donna, the State must have shown that it was his purpose to cut and stab her and also to cause her death. On the other hand, motive is not an element of murder, and thus the State did not have to show a reason for the killing. *See Young v. State*, 696 N.E.2d 386, 391 (Ind. 1998) (rejecting claim that motive instruction diluted State's burden of proof of intent).

Campbell relies on *Kriner v. State*, 699 N.E.2d 659 (Ind. 1998), in which the trial court had refused the defendant's tendered instruction that absence of motive was "in the nature of an exculpatory circumstance which a defendant on trial is entitled to establish and which may be considered by the jury as a circumstance favorable to the accused." *Id.* at 664. The State had argued that this point was adequately covered by an instruction informing the jury that the State was not required to prove motive. The Court disagreed, reasoning, "[T]here is no link between the elements of the crime and whether a particular fact (lack of motive) may be relevant or how it may be weighed." *Id.*[6]

Campbell points to the Court's "no link" observation in *Kriner* and claims it mandates reversal. We take from *Kriner* the straightforward idea that motive or lack of it may be argued by both sides in a criminal trial as something the jury may consider in weighing the evidence.

---

[6] The Court nonetheless determined that the tendered instruction singled out one circumstance and identified it as exculpatory, thereby infringing on the jury's role. *Kriner*, 699 N.E.2d at 665. It therefore upheld the trial court's refusal of the tendered instruction. *Id.*

B. Response to Note from Jury

During deliberations, the jury sent out a note asking, "[C]an we convict the defendant if we feel he was present and at the crime scene while the crime was being committed?" Tr. p. 1444. The court indicated its response would be, "[P]lease read the instructions carefully and continue deliberations." *Id.* Campbell noted that neither party had wanted an instruction on accomplice liability, but he believed the jury should be given the answer "no." *Id.* at 1444-45. The State agreed with the court that the jury should be instructed to re-read the instructions. *Id.* at 1444. The court said the jury had "all the law they need to decide this case" and gave its response over objection. *Id.* at 1445.

Modern practice under Indiana case law and the Indiana Jury Rules affords trial judges much more flexibility in responding to jury requests than used to be the case, but answering a jury question on a matter of law by directing them to re-read all instructions is still nearly a safe harbor. Still, when a jury question coincides with an error or legal gap in the final instructions, a response other than re-reading the final instructions has long been permissible. *Riley v. State*, 711 N.E.2d 489, 493 (Ind. 1999).

Campbell says the jury's question presented a legal gap in the instructions and that the trial court should have answered "no" or instructed the jury on accomplice liability.

The jury was instructed that Campbell could be convicted if the State proved beyond a reasonable doubt that he knowingly or intentionally killed Donna. Tr. p. 1426 (Final Instruction 5). The jury was further instructed on just what is required to find that a person charged with committing a crime acted knowingly or intentionally, *id.* at 1427

16

(Final Instruction 6), and these necessarily could not include mere presence.  As the trial court noted, the jury had all the law it needed to answer the question.

The jury was apparently interested in Campbell as an accomplice, and some of the evidence may have pointed to him as an accomplice, and it is slightly plausible that the trial might have proceeded on the basis of accomplice liability.  But it had not: the State proceeded on a theory of principal liability, and until the jury's question Campbell did not want an accomplice liability instruction.  Changing the theory of the case during deliberations would have been nearly inconceivable.[7]

A careful reading of the instructions answered the jury's specific question.  The trial court was well within its discretion to tell the jury to re-read the instructions.

## VI. SUFFICIENCY OF THE EVIDENCE

To convict Campbell of murder, the State had to prove beyond a reasonable doubt that he knowingly or intentionally killed Donna.  *See* Ind. Code § 35-42-1-1(1) (1989).

The evidence shows that Loretta Earl and Campbell had a tumultuous relationship.  During an argument in May 1992, Campbell told her he would kill someone, it would be her fault, and she would have to live with it.  Loretta left him on May 15, 1992, but saw him again two to three weeks later.

Campbell's nephew Ronnie Anglin testified that Campbell and Loretta argued at a barbecue at his house in 1992.  The next morning, Ronnie saw Campbell "[a] little scratched up" and with his clothing "a little messed up."  Tr. pp. 453, 450.  Campbell told

---

[7] Actually, the court would have erred by answering the jury's question with a simple "no," as suggested by Campbell at trial, as that answer would have been misleading.

17

Ronnie that Loretta called the police on him, and he had gotten scratched up from running through the woods. Campbell stayed at Ronnie and Judy's that night and left within a couple of days.

Ronnie's wife Judy Anglin testified that Campbell and Tommy lived with them in Black Oak in June 1992. One morning, she woke before daylight and saw Ronnie open the front door and Campbell and Tommy walk in. Judy noticed Tommy's shirt "looked really wet" and was covered in "white curly hair" before Ronnie "told me to get my F'ing butt in the bedroom and shut the door." *Id.* at 324. Later that day, Judy went into the front bedroom where the brothers stayed and saw Tommy's sweatshirt with "brown looking stains" and "white curly hair" on it and Campbell's corduroy jacket with "brown stains" on it as well. *Id.* at 325. Early the next morning, Judy saw Campbell and Tommy headed "down the railroad tracks" with "[t]wo little bags." *Id.* at 326. Judy did not see the brothers again, and she and Ronnie moved to Kentucky about two months later. Ronnie never wanted to talk about the incident but did tell Judy he buried Campbell's and Tommy's clothes in the backyard.[8]

Although Campbell repeatedly denied knowing Donna in his interview, Ronnie testified that Campbell "did a little bit of work for her," *id.* at 465, and stayed at her place a few times. Ronnie further said that "the whole family knew" that Campbell would always go over to Donna's and talk with her. *Id.* at 480.

---

[8] Detective Eaton and Ronnie went to the area where his home was located in June 1992 to try to recover the clothing, but by then the lot was buried under a graded hill supporting a bridge. Tr. p. 1230.

18

Two hairs found on Donna's body exhibited scientific matches to Campbell's DNA profile. One had a statistical significance of one in 13 quadrillion in the Caucasian population, and the other had a statistical significance of one in 710 billion in the Caucasian population.

This is all probative evidence from which a reasonable jury could have found Campbell guilty beyond a reasonable doubt.

## VII. SENTENCING

Campbell finally contends that the trial court erred in sentencing him. The sentencing statute in effect at the time a crime is committed governs the sentence for that crime. *Gutermuth v. State*, 868 N.E.2d 427, 431 n.4 (Ind. 2007).

At the time of Campbell's crime, the presumptive sentence for murder was forty years, with no more than twenty years added for aggravating circumstances and no more than ten years subtracted for mitigating circumstances. Ind. Code § 35-50-2-3 (1987).

In its sentencing order, the court found one aggravator and one mitigator. The mitigator was Campbell's "minimum prior contact with the criminal justice system." Appellant's App. p. 72. The aggravator was the nature and circumstances of the crime:

> The Court finds the nature and circumstances of the crime to be a significant aggravating factor in that the victim was brutally murdered in her own home. There was no evidence of forced entry or provocation on her part. The victim was found nude in her bedroom. Her throat had been deeply slashed more than once. A steak knife was lodged in her back and her home had been ransacked. There were large amounts of blood throughout the home. This murder was savage and heinous, such as shocks the senses. This was a cold case that remained unsolved for almost twenty years.

19

*Id.* Finding that the aggravator substantially outweighed the mitigator, the court sentenced Campbell to fifty-eight years.

Campbell argues that there was no evidence that Donna's throat had been slashed more than once. The pathologist who performed the autopsy determined that Donna had suffered a wide slash wound to her neck that cut her larynx and esophagus. Although her throat may not have been slashed more than once, the court was plainly warranted in finding that the murder was brutal, savage, heinous, and "even ghoulish," as noted during the sentencing hearing. Tr. p. 1676.

Campbell also argues that the fact that the murder remained unsolved for nearly twenty years does not warrant a departure from the presumptive sentence. In his reply brief, he adds that his failure to take responsibility should not be aggravating as he has consistently maintained his innocence. Appellant's Reply Br. pp. 9-10. The court, however, did not comment on his failure to take responsibility. It merely noted that the case remained unsolved for a long period of time as part of the nature and circumstances of the crime. This was not an abuse of discretion.

Campbell next claims that the trial court enhanced his sentence in violation of *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004), and *Smylie v. State*, 823 N.E.2d 679 (Ind. 2005), by relying on an aggravator not found by a jury beyond a reasonable doubt. The State responds that this claim is waived.

In deciding *Smylie*, the Supreme Court recognized that applying regular rules of waiver would be unjustifiable: "Because *Blakely* represents a new rule that was sufficiently novel that it would not have been generally predicted, much less envisioned

to invalidate part of Indiana's sentencing structure, requiring a defendant or counsel to have prognosticated the outcome of *Blakely* or of today's decision would be unjust." 823 N.E.2d at 689. This policy was reflected in a decision Campbell cites, *Kincaid v. State*, 837 N.E.2d 1008 (Ind. 2005), where the defendant did not raise a *Blakely* objection at the sentencing hearing and instead raised the issue for the first time on appeal. The Supreme Court said that "[f]or cases in which the appellant's initial brief was filed after the date of the *Smylie* decision, a specific *Blakely* claim must be made in the appellant's initial brief on direct appeal for it to be reviewed on the merits." *Id.* at 1010. In *Kincaid*, however, the sentencing hearing occurred just two weeks after *Blakely* was issued.

Campbell's sentencing hearing occurred well over seven years after *Blakely*. Had Campbell wanted to stand on his right to have a jury determine aggravating factors, he should have said so. To hold otherwise would empower a defendant to tactically withhold such a demand if he believed he might be more persuasive to a judge during sentencing, and then claim error later. We conclude that Campbell's *Blakely* claim is waived for failure to lodge an objection at the sentencing hearing. *See Robles v. State*, 705 N.E.2d 183, 187 (Ind. Ct. App. 1998) (rejecting defendant's claim for first time on appeal that he was not expressly asked if he wished to make a statement at sentencing and noting that "a party may not sit idly by, permit the court to act in a claimed erroneous manner, and then attempt to take advantage of the alleged error at a later time").

## CONCLUSION

We therefore affirm the judgment of the trial court.

VAIDIK, J., and BROWN, J., concur.

21