

FILED

Dec 20 2024, 9:24 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



# IN THE
# Court of Appeals of Indiana

Alijah Jones,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*

December 20, 2024

Court of Appeals Case No.
23A-CR-1644

Appeal from the Marion Superior Court

The Honorable Shatrese Flowers, Judge

Trial Court Cause No.
49D28-2106-MR-18451

**Opinion by Judge Kenworthy**
Judges May and Vaidik concur.

**Kenworthy, Judge.**

## Case Summary

[1]     Widespread news reporting and social media coverage of George Floyd's death while in Minneapolis police custody in May 2020 led to many large-scale protest and counter-protest demonstrations across the country. During the day on Saturday, May 30, 2020, there were protests and demonstrations in downtown Indianapolis. "As the day turned into night, parts of those demonstrations and protests turned . . . riotous and destructive in some places." *Tr. Vol. 3* at 205. The epicenter of the chaos was around Monument Circle, but large groups of people were having confrontations with police several blocks north at the Indiana War Memorial, as well. Between 11:20 p.m. and 11:40 p.m., several crimes were committed east of the War Memorial within a two-block perimeter.[1] The State charged Alijah Jones, Nakeyah Shields, and Marcus Anderson with the crimes. The three defendants had a joint jury trial.

[2]     The jury found Jones guilty of felony murder,[2] six counts of Level 3 felony armed robbery,[3] and two counts of Level 3 felony attempted armed robbery.[4]

---

[1] The crimes occurred from Michigan Street to the north and New York Street to the south, and Pennsylvania Street to the west and Delaware Street to the east, but were focused in the middle of that area—the 400 block of Talbott Street. Talbott Street is between Pennsylvania and Delaware Streets, all north-south streets. The 400 block is north of Vermont Street and south of Michigan Street. Talbott Street is sometimes referred to in the record as "the alley."

[2] Ind. Code § 35-42-1-1(2) (2018).

[3] I.C. § 35-42-5-1(a)(1) (2017).

[4] I.C. §§ 35-42-5-1(a)(1) and 35-41-5-1 (2014).

The trial court ordered Jones to serve an aggregate sentence of 164 years.  Jones appeals his convictions and sentence, raising the following issues[5]:

> 1) Did the trial court err in allowing the State to add two counts of robbery days before the jury trial?
>
> 2) Did the trial court err in admitting social media evidence?
>
> 3) Was there sufficient evidence to support Jones' conviction of felony murder?
>
> 4) Did the trial court commit fundamental error in instructing the jury on the elements of felony murder?
>
> 5) Did the trial court err when it denied Jones' request for surrebuttal argument?
>
> 6) Is Jones' sentence of 164 years inappropriate when considering the nature of his crimes and his character?

[3]     We affirm.

---

[5] Jones requests reversal of his convictions on all counts for the errors alleged in issues 1 and 2, and reversal of his felony murder conviction either for insufficient evidence as alleged in issue 3 or for the errors alleged in issues 4 and 5.

## Facts and Procedural History

### The Crimes

[4] Jones, Shields, and Anderson were with Dorian Murrell and another man[6] downtown the night of May 30. Murrell was Jones' brother and Shields' boyfriend. Shields, Anderson, and Murrell arrived together in Murrell's car and parked near Vermont and Talbott Streets. Shields' and Anderson's cell phones were used in that general area between 11 p.m. and midnight. A car matching the description of the car Jones drove was also parked near Vermont and Talbott Streets that night.

### *Zandy Robbery (Count 9)*

[5] After a day out, Amy Zandy returned to her apartment building downtown around 11:20 p.m. and parked on the first floor of the parking garage. The garage had entrances on Vermont Street on the north side and on Delaware Street on the east side. Zandy stayed in her car to text a friend and saw several people walking into the garage. One was a woman wearing a brightly colored jacket who Zandy felt "was with that group but was a little bit removed[.]" *Tr. Vol. 5* at 194. The group approached her car and a man in a mask with a gun knocked on her window and told her to give him the "f\*\*king keys." *Id.* at 180. Zandy opened the driver's side door to comply, which caused all the doors to unlock. Multiple people entered the car, rummaging through Zandy's things.

---

[6] The State alleged this fifth person was involved in the crimes but was not able to identify him.

The person who entered the front passenger side pulled Zandy down onto the center console by the collar of her shirt and held her there while the man with the gun repeated his demand for her keys. Zandy told them where the keys were and to "[t]ake whatever you want." *Id.* at 181. Most of the group left the car, taking Zandy's cellphone, wallet, and makeup bag, but leaving her keys. The man in the passenger seat remained, and he and Zandy "just star[ed] at each other long enough" that Zandy finally said, "I don't know what to do right now." *Id.* at 182. The man said, "[I]t's okay baby girl," and left the car. *Id.* at 185. The group walked north on Delaware Street from the parking garage toward Michigan Street. Zandy left the parking garage to drive to a friend's house and waved down a police officer about a block away to make a brief report.

### Eggers Robbery (Count 8)

Kimberly Eggers went to Monument Circle to find her friends. But she could not find them and felt she should leave the area because it was "pretty crazy." *Tr. Vol. 4* at 28. She started walking north and called a friend to come pick her up. On Michigan Street between Pennsylvania and Delaware Streets, Eggers heard someone behind her say, "[H]ey." *Id.* at 32. Thinking it was the friends she had been looking for, Eggers turned around. Instead, she was surrounded by four men she did not know. Someone hit her in the face. One man took her cellphone out of her hand, and another took her backpack. A man with dreadlocks hit her again and she fell to the ground, losing her glasses. The men kicked her several times before walking west on Michigan Street. Eggers called

out, asking them to give her things back. She saw the four men with someone in a bright jacket and a man on a bike. The man with the dreadlocks turned around, and Eggers saw what she thought was a crowbar in his hand. She then ran the other way. Surveillance video obtained from a nearby building showed the robbery occurring at 11:31 p.m.

### *Morris, Thompson, and Bell Robberies (Counts 2, 3, and 4)*
### *Fuentes Robbery, Mitchell Attempted Robbery (Counts 5 and 6)*

[8] When Sofia Fuentes and Saige Mitchell went downtown "to kind of see what was going on, try and get involved in the protests," they did not know the protests had turned violent. *Tr. Vol. 4* at 208. Near Monument Circle, they "started to see things getting broken into." *Id.* at 209. They were uncomfortable and decided to leave. They went on "an unplanned walk around the city," trying to stay with larger groups and find their way back to their car. *Id.* Fuentes was live streaming on Instagram as they walked around. When Fuentes and Mitchell were near Zandy's parking garage, they heard—and the video captured the sound—of gunshots. They "freak[ed] out," headed in another direction, and ended up on Vermont Street near Talbott Street. *Id.* at 210.

[9] Around this same time, out-of-towners Byron Morris, Alejandro Thompson, and Abbey Bell were accompanying their Indianapolis-area friend Jared Sarr downtown for Sarr to pick up his backpack from a friend. They parked in a lot on Talbott Street behind an apartment building around 11:30 p.m. While Sarr remained in the car texting his friend, Morris, Thompson, and Bell stood

outside the car. Thompson noticed four men approaching them. At the same time, Sarr got out of the car and shouted at everyone to run.

[10] Sarr ran into the apartment building, but Morris, Thompson, and Bell were grabbed and told to empty their pockets. All three were thrown to the ground. Two men started kicking Thompson while another man "tussle[d]" with Bell over her cellphone. *Id.* at 86. The man tussling with Bell fired a shot into the ground near her when Bell could not remember her Apple ID. Morris was also being yelled at to enter his Apple ID into his phone. Bell said her attacker was wearing all black and a ski mask. Morris recalled one of the men wearing a COVID-style facemask, a red baseball cap, and a black sweatshirt; a second man had dreadlocks and was wearing a facemask and a white t-shirt. Bell and Morris saw two firearms among the men.[7]

[11] Fuentes and Mitchell "stumbled upon [the] robbery going on" on Talbott Street. *Id.* at 210. They saw three or four masked men standing over "a bunch of people that were on the ground, and one of them had a gun." *Tr. Vol. 5* at 205. The man with the gun was wearing a white top and had dreadlocks. He yelled to Fuentes and Mitchell to get down and waved the gun toward the ground. They complied, laying down on their stomachs. The men went through their pockets, then flipped Fuentes over and took her bag. Someone fired a shot near Mitchell's head. The men ran north toward Michigan Street

---

[7] Thompson did not testify at trial.

when they saw police lights in the distance. Bell "grabbed [her cell phone] when [the men] started running." *Tr. Vol. 4* at 68. But the men took Morris' cellphone, wallet, and electric cigarette vape; Thompson's cellphone and wallet; and Fuentes' backpack with Mitchell's car keys in it. They took nothing from Mitchell personally. Morris estimated the robbery lasted three to five minutes.

[12] Sarr came out of the apartment building and motioned for Morris, Thompson, and Bell to come inside. They "dove down" into Sarr's friend's basement apartment. *Id.* at 92.

[13] Fuentes and Mitchell ran south toward Vermont Street. Fuentes called 9-1-1 to report the robbery. As Fuentes and Mitchell stood at the corner of Pennsylvania and Vermont Streets, they heard two or three gunshots in the area they had come from. Sarr, Morris, and Bell also heard "5 or 10" gunshots shortly after entering the apartment building. *Id.* at 93.

[14] Soon after hearing the gunshots, Fuentes and Mitchell saw an ambulance and police cars head toward Talbott Street and "decided to walk up, tell them that [they] had just gotten robbed and . . . think that it might be a part of whatever had just happened." *Id.* at 217. Returning to Talbott Street "[m]aybe seven minutes" after they left, they saw someone face down on the ground who had not been there before. *Id.* at 218.

### *Beaty Murder (Count 1)*

[15] Christopher Beaty lived in the Colonial Apartments at the corner of Delaware and Vermont Streets. At 11:35 p.m., Beaty sent a Snapchat message. That was

his last outgoing message that day.  At 11:36 p.m., Beaty left his apartment through the Delaware Street entrance and turned right, walking toward Vermont Street.  He was holding his cellphone in his hand.  He walked by Shields who was standing on Vermont Street and told her to be safe.  Shields said shortly after that interaction she heard gunshots come from Talbott Street and ran.  The body Fuentes and Mitchell saw lying face down when they returned to Talbott Street was Beaty's.  He had been shot multiple times.

### Sunkara Attempted Robbery (Count 7)

Kiran Sunkara heard about the property damage being done downtown and went to check on his office on Pennsylvania Street.  He parked in the 400 block of Talbott Street facing north with Vermont Street immediately behind him.  Finding no damage at his office, Sunkara worked for a while and left about 11:10 p.m.  He walked to his car to leave his backpack and then walked to a nearby mailbox to mail his rent check.  The walk to the mailbox from his car took seven to ten minutes and took Sunkara past the Indiana War Memorial, where there were "mobs" of people.  *Tr. Vol. 4* at 122.  Sunkara returned to his car, buckled up, and locked his doors.  Within a few seconds, two men came from behind toward his car.  One man—wearing a dark-colored shirt—approached the driver's side and told Sunkara to get out.  The other man—wearing a light-colored shirt—approached the passenger side and pointed a gun, telling Sunkara to get out of the car and tapping the gun on the windshield.  Sunkara said, "I got no money," reversed his car quickly onto Vermont Street, and sped away.  *Id.* at 121.  As he was reversing, a shot was fired at his car.  He

did not see anyone else in the alley during this incident. Sunkara did not immediately contact police because he "thought they wouldn't be of any help" given the "mobs" of people he saw when walking back to his car from the mailbox. *Id.* at 122.

**The Investigation**

[17] Detective Stephen Smalley was the lead investigator of the Beaty murder. He responded to the call of a person down in the 400 block of Talbott Street at about 11:40 p.m. on May 30. Beaty was face down on the street, head pointed south. No surveillance cameras covered this block and there were no eyewitnesses to the shooting. Fuentes, Mitchell, Morris, Thompson, and Bell had remained nearby and spoke with investigators at the scene. Bell provided her cell phone for testing because one of the perpetrators had grabbed it.

[18] Crime scene specialist Kaylee Schellhaass responded to the scene in the early morning hours of May 31. Schellhaass collected two bullet casings from the street. She also found Beaty's black iPhone to the north of his body. She collected swabs from Beaty's and Bell's phones. The swabs were tested for DNA; Jones, Shields, Anderson, and Murrell were excluded as contributors of DNA recovered from both phones.

[19] A little over two hours after Beaty's body was found, Murrell was shot at Monument Circle in an unrelated incident. Murrell was taken to Eskenazi Hospital where he died from his injuries. Jones, Shields, and Anderson were with Murrell when he was shot. Detectives investigating the Murrell shooting

spoke with Jones at the hospital and noticed a man wearing a distinctive brightly colored jacket who identified himself as "Marcus."

[20] On the afternoon of May 31, David Munoz contacted police. He lived in the same apartment building as Zandy and had parked his car on the first floor of the garage around noon on May 30. When he returned to his car the next day, the driver's side window was shattered. Munoz started to clean his car but stopped when he found a bullet among the debris. Officers recovered the bullet and a casing from the car.

[21] On June 1, a passerby contacted police after finding bullet casings in shrubs along Talbott Street. Schellhaass returned to the scene and collected three additional casings. Also on June 1, Sunkara contacted police after reading a man was killed within a few feet of where he was attacked. Police recovered a bullet from the passenger-side engine compartment of Sunkara's car.

[22] Dr. Christopher Poulos, chief forensic pathologist at the Marion County Coroner's Office, examined Beaty's body. He identified four gunshot wounds to the back of Beaty's body on the upper left arm, torso, chest, and base or back of the neck. Bullets were recovered from two of the wounds. Beaty's body also showed evidence of blunt force injuries. Dr. Poulos acknowledged these injuries "could be explained by a fall after being shot" but believed it was "more probable than not that they were the result of a physical altercation." *Tr. Vol. 4* at 23–24. He explained, "[W]hen we have a fall . . . I expect to see [injuries] in one plane, [but] in this case, we have more than one area." *Id.* at 24. Dr.

Poulos determined Beaty's cause of death was multiple gunshot wounds and his manner of death was homicide.

[23] Timothy Spears, a forensic firearms examiner, examined the five casings recovered from Talbott Street, the two bullets recovered from Beaty's body, the bullet and casing found in Munoz's car, and the bullet recovered from Sunkara's car. Detective Spears determined all the casings came from the same firearm and all the bullets came from the same firearm. A firearm associated with these crimes was never recovered.

[24] Detective Ted Brink was assigned to investigate the Zandy robbery. Detective Brink obtained high-quality surveillance video from the parking garage. The video shows five people—a woman and four men—walking into the parking garage and approaching Zandy's car.[8] They were all wearing some sort of face covering and/or medical gloves. Police created four "be-on-the-lookout" fliers ("BOLOs") containing still photos taken from the video, information about the time and date of the offense, and contact information. The BOLOs were released to the media on June 4.

---

[8] The woman is wearing a jacket with bright red, yellow, blue, and green blocks of color and medical gloves. One man is wearing a red baseball hat and Tommy Hilfiger sweatshirt; another is wearing jeans and a white t-shirt with a teddy bear on it. Those two men are wearing medical facemasks. Another man is wearing a dark long-sleeved shirt, black pants with white stripes down the side, and black shoes with a white sole. He is wearing a ski mask. The fifth person is wearing a Champion sweatshirt and has something wrapped around the bottom half of his face. The video shows all five passing by the car and then the four men returning and robbing Zandy. The man in the red baseball hat passes something to the man with the ski mask, who then knocks on the driver's side window and shows a gun; the man in the white t-shirt enters the front passenger side of the car.

[25] After comparing the Zandy robbery video to reports, pictures, and videos from other crimes that occurred on May 30, Detective Brink contacted Detective Smalley to say he believed their investigations were related. And several people contacted IMPD after seeing the BOLOs. Among them, Fuentes and Morris each told Detective Smalley the suspects depicted were the same people who robbed them on Talbott Street. Eggers also saw the BOLOs and recognized the individuals depicted as the men who attacked her, but she did not report the crime against her until 2022. Latanya Lewis—who had known Jones since he was in junior high school—saw the BOLOs and reported Jones as one of the suspects. Officers investigating Murrell's death recognized the clothing on one of the suspects as matching what Murrell was wearing at the time he was shot.

[26] Armed with the Zandy robbery video, surveillance video from various other buildings around the area, Fuentes' livestream video, and tips from the BOLOs, among other things, Detective Smalley managed to identify four of the suspects and follow their movements around Vermont and Talbott Streets on May 30. Detectives then gathered additional evidence, including video of cars matching the description of Murrell's and Jones' cars parked near Vermont and Talbott Streets during the incidents, Zandy's positive identification of Anderson from a photo array, the subjects' cell phone location data, and articles of clothing collected during a search of Jones' apartment.

[27] Detective Smalley searched the suspects' social media accounts and got a search warrant for records from their Facebook accounts. His review of those records revealed several private message conversations seemingly referring to

the crimes. On June 2, 2020, Anderson sent Jones a message asking if he could stay with him and get rides to and from work. *Ex. Vol. 1* at 193. Jones replied, "That ain't no good idea you need to be hiding out and sh*t from the other night . . . . Aye you need to lay low get out of town or something I just seen the report from that dude. . . . Ima send it to you but you gotta delete our whole message thread and all that sh*t." *Id.* at 193–94. Anderson asked, "What dude," and Jones replied, "N**** from the alley." *Id.* at 194. On June 4, Anderson sent Shields a message stating, "Aye somebody wanna buy that gun. Ask bro do he wanna sell it." *Id.* at 190. Shields responded, "Don't talk like that on my phone. . . . I don't know what you talking about." *Id.* Anderson replied, "My bad u right." *Id.* On June 5, Jones sent Shields a message saying, "Yea I'm straight just staying out the way especially cause of you know what so I really ain't been out." *Id*. at 183. On June 10, Anderson sent a message to an individual named Sanders stating, "I need to move down there. Tbh I'm in a lil trouble up here and I def need to get tf lost." *Id.* at 198. They also shared screenshots of the BOLOs and a social media post and news stories about Beaty's murder.

[28] Shields and Anderson both spoke with Detective Smalley. Both admitted being downtown on May 30 in the company of Murrell. Shields said she was "at the end of the alley where Chris Beaty was murdered . . . standing there by a car talking to [Murrell]." *Tr. Vol. 6* at 9. Beaty walked by, smoking a blunt. Shields commented the blunt "seemed nice" and Beaty told her to "be safe out tonight because it's crazy out." *Id*. Shortly after, Shields heard a gunshot and

ran. Anderson said he walked through a parking garage and "interacted with someone." *Id.* at 12. Shields and Anderson were unable to leave downtown because the location where their car was parked was "blocked off by police and crime scene tech." *Id.* at 10. They were both with Murrell when he was shot and went to the hospital to be with him.

**Pretrial Proceedings**

[29] In August 2020, the State charged Jones with Level 3 felony armed robbery, Level 3 felony criminal confinement, and Level 4 felony unlawful possession of a firearm by a serious violent felon arising out of the Zandy robbery (the "Zandy case").[9]

[30] In June 2021, a grand jury indicted Jones for murder, four counts of armed robbery (for allegedly taking property from Morris, Thompson, Bell, and Fuentes), and two counts of attempted armed robbery (for allegedly attempting to take property from Mitchell and Sunkara) (the "MR case").[10] Shortly after, the State sought and was granted a no contact order in the MR case prohibiting Jones from having contact with the alleged victims or witnesses Lewis, Munoz,

---

[9] Anderson was charged with crimes arising from the Zandy robbery on the same date. In December 2020, the State charged Anderson by information with one count of murder; one count of felony murder; four counts of armed robbery related to Bell, Morris, Thompson, and Fuentes; two counts of attempted armed robbery related to Mitchell and Sunkara; and one count of pointing a firearm at Thompson.

[10] A grand jury also indicted Shields for felony murder, five counts of armed robbery, and one count of attempted armed robbery. The five counts of armed robbery alleged Shields took property from Morris, Thompson, Bell, Fuentes, and Zandy. The attempted robbery count alleged Shields attempted to take property from Mitchell.

Sarr, and Zandy. Jones was advised of the no contact order at his initial hearing. At the time of the grand jury proceedings, police knew about the Eggers robbery because it was visible on surveillance video but did not know Eggers' identity.

[31] At a pretrial conference in January 2022, Jones requested the Zandy case be continued and set alongside the MR case. That request was reiterated at a July 2022 pretrial conference.

[32] In August 2022, the State moved to join for trial the Zandy case and the MR case, alleging the charges "are all part of a single scheme or plan and are a series of connected acts." *Appellant's App. Vol. 2* at 79. The trial court held a hearing at which the State explained:

> [All charges] stem from multiple robberies that occurred in the downtown area within a 25- to 30-minute span, starting from the first robbery to the final. Additionally, they all occur within a one block radius. . . . [I]t's essentially the same case, the same evidence, and all of these cases are intertwined with one another, with the same witnesses. And so for efficiency, we would ask that the . . . cases be joined.

*Tr. Vol. 2* at 64. Jones objected:

> [W]e're getting into dangerous territory with why the State wants to put these cases together. . . . [I]t's skirting pretty close to propensity. The State, in essence, wants to argue that if these people committed all these robberies, they must have committed this murder as well that occurred around the same time.

*Id.* at 69. The trial court took the matter under advisement.

[33] In the summer of 2022, Eggers contacted police to report she had been robbed on May 30, 2020. Jones took Eggers' deposition in the fall of 2022. On May 9, 2023—with trial set to begin on May 22—the State moved to amend Jones' charges in the MR case to add a count of Level 3 felony robbery related to the Eggers robbery (the "Eggers count").

[34] At a pretrial conference on May 10, 2023, the trial court denied the State's request to join the *Zandy* case and confirmed Jones was set to be tried on the MR case jointly with Anderson and Shields beginning May 22. On May 17, the State amended its motion to amend, still seeking to add the Eggers count and now also seeking to add a count of Level 3 felony armed robbery related to the Zandy robbery (the "Zandy count").[11] The trial court considered this motion at the final pretrial conference on May 18. Jones objected to the amendment because it was untimely—having been filed "668 days" after the omnibus date—and, as to the Zandy count, because it had essentially already been ruled on when the trial court denied the motion to join the *Zandy* case. *Tr. Vol. 2* at 133. Jones also renewed his improper propensity evidence argument. The State responded that Jones had known of the State's intention to try the cases together since its August 2022 motion to join. The State also

---

[11] Also on May 17, the State filed a notice of intent to introduce evidence of the Zandy and Eggers robberies, requesting the trial court "admit the proposed evidence as intrinsic evidence related to the charged offenses or in the alternative as permissible evidence under Indiana Rule of Evidence 404(b) to show motive, intent, opportunity, identi[t]y, or plan." *Appellant's App. Vol. 2* at 117.

noted Shields was already charged with robbery of Zandy and "it would be confusing for the jury . . . to hear evidence about this particular charge but only be permitted to deliberate on it with regard to [Shields]." *Id.* at 132. The trial court granted the motion and allowed the State to add the Eggers and Zandy counts.[12] Jones did not request a continuance. The trial court later granted the State's motion to dismiss the Zandy case.

## The Trial

[35] The joint jury trial began on May 22, 2023. Among the trial court's preliminary instructions to the jury was the following:

> In this case, the [S]tate of Indiana has charged [Jones] with Count I, felony murder, a felony which charge reads as follows:
>
> . . . [O]n or about May 30th, 2020, [Jones] did knowingly kill another human being to-wit: Christopher Beaty while committing or attempting to commit robbery that is to knowingly or intentionally take property from the person or presence of another person by use of force or by threatening the use of force or by putting any person in fear.

*Tr. Vol. 3* at 178. The trial court also read the substantially similar felony murder charges against Anderson and Shields as part of the preliminary

---

[12] The trial court also granted the State's motions to amend Anderson's charges to add counts for the Zandy and Eggers robberies, and to amend Shields' charges to add a count for the Eggers robbery.

Jones filed a motion in limine seeking to limit any reference to the Zandy and Eggers robberies, among other things, that was to be considered at the May 18 pretrial conference. Following the trial court's grant of the State's motion to amend, Jones noted those requests were moot. *See Tr. Vol. 2* at 173. Jones did make a continuing objection at trial to all evidence regarding the Zandy charge. *See id.* at 241–42.

instructions; both included the use or threat of force/fear language in the definition of robbery. *See id.* at 173, 183.

[36]     The State introduced more than 150 exhibits, including certified business records from Facebook of communications involving Jones, Shields, and Anderson. Detective Smalley explained the process of filing a preservation request, obtaining a search warrant, and reviewing the records produced. When the State offered Jones' Facebook records, Jones objected, claiming the records had not been sufficiently authenticated. *See Tr. Vol. 7* at 35–50. The State intended to introduce a set of Facebook records for each defendant, and the trial court heard all defendants' objections at one time. The trial court admitted the records over objection.

[37]     After the State's initial closing argument, Anderson argued there was no evidence Beaty's cell phone or any other property was taken from him and there was no evidence anyone struggled with him. *Tr. Vol. 7* at 117–18. Jones claimed the other victims may have been robbed, but Beaty had just been killed. *Id.* at 133. And Shields argued there was "no evidence whatsoever" that Beaty was robbed. *Id.* at 139.

[38]     In rebuttal, the State argued:

> [W]e know that [Beaty] got to the end of [Talbott Street] because you can see where his phone is. His phone is lying on the ground, almost to the exact location where we know [Bell, Morris, Mitchell, Fuentes, and Thompson] were being robbed. Something happened that that phone is not in his hands anymore.

> Every victim of the robbery at the end of [Talbott Street] said that they were trying to take their phones, standing over them, making them enter their passwords, trying to get into the phone.
>
> The phone is at the end of [Talbott Street] and . . . Beaty has, as Dr. Poulos testified, injuries that are more likely to have come from an altercation than simply falling on the ground.
>
> You saw the photos of [Beaty]. He did not just fall on the ground. And he's not found by his phone. He had turned and he had run. And he was shot four times, four times in the back of his body.

*Id.* at 149–50. At the end of the State's rebuttal argument, Jones asked for surrebuttal under Indiana Jury Rule 27 because the State's assertion that someone tried to take Beaty's phone and "its distance from his body was evidence that a robbery occurred" was not an argument the State advanced in its closing argument. *Id.* at 156. The trial court denied the request and proceeded to give the jury final instructions.

[39] The trial court first reminded the jury it had previously given preliminary instructions and directed, "You should continue to consider them during your deliberations." *Id.* at 157. The trial court then recited the elements of each crime Jones was charged with, beginning with the elements of felony murder:

> Defendant Alijah Jones is charged in Count I with felony murder, a felony, which is defined by statute as follows: A person who kills another human being while committing or attempting to commit robbery commits murder, a felony.

> Before you may convict [Jones] of Count I, felony murder, the State must have proved each of the following beyond a reasonable doubt:
>
> One, [Jones]; two, while committing or attempting to commit robbery, which is defined as knowingly or intentionally taking property from another person or presence of another person, three, killed, four, Christopher Beaty.
>
> If the State fails to prove each of these elements beyond a reasonable doubt, you must find [Jones] not guilty of felony murder as charged in Count I.

*Id.* at 167–68; *see also Appellant's App. Vol. 3* at 21. Jones did not object to this instruction or tender an alternative instruction. In instructing the jury on the armed robbery and attempted armed robbery counts as to all three defendants, the trial court instructed the jury over twenty times that "robbery is defined by law as follows: A person who knowingly or intentionally takes property from another person or from the presence of another person by using or threatening the use of force[.]" *Tr. Vol. 7* at 161–79. The trial court also instructed the jury on accomplice liability and that "[s]tatements made by the attorneys are not evidence." *Id.* at 160. The jury found Jones guilty of all charges.[13]

---

[13] Shields was found guilty of felony murder, six counts of Level 3 felony armed robbery (Morris, Thompson, Bell, Fuentes, Zandy, and Eggers), and one count of Level 3 felony attempted armed robbery (Mitchell). She was sentenced to 108 years. An opinion in Shields' appeal in Cause Number 23A-CR-1653 is also handed down on this date.

Anderson was found guilty of felony murder, six counts of Level 3 felony armed robbery (Morris, Thompson, Bell, Fuentes, Zandy, and Eggers), and two counts of Level 3 felony attempted armed robbery (Mitchell and

**Sentencing**

[40] The presentence investigation report prepared for Jones' sentencing reflects Jones has no known juvenile record, but eight arrests as an adult, with two felony convictions for robbery and three misdemeanor convictions. A community corrections placement was revoked, and he was on probation at the time of the May 30 offenses. Jones provided a sentencing memorandum to the trial court, proffering the following mitigating factors: Jones experienced significant childhood trauma; his two children will be negatively impacted by his incarceration; his good conduct and participation in programming while in custody; his limited criminal history; and his age at the time of the offense.

[41] Eggers testified at the sentencing hearing, highlighting the significant impact the incident had on her, but also expressing her forgiveness and requesting a sentence that is "fair, yet not harsh, because I believe . . . grace is what bears the most fruit, and that's the seed that I want to plant." *Tr. Vol. 8* at 18. Two of Beaty's friends and his sister testified about Beaty and the impact of his life and death. And Jones spoke in allocution, telling Beaty's friends and family he was sorry for their loss.

[42] Jones' counsel elaborated on some of the mitigators proffered in the sentencing memorandum. Counsel called Jones' childhood "noteworthy" for being shuttled between his parents' homes in different states and being neglected

Sunkara). He was sentenced to 164 years. An opinion in Anderson's appeal in Cause Number 23A-CR-1645 is also handed down on this date.

while in his father's care, including being exposed to drugs and alcohol at a young age by his father. *Id.* at 75. Counsel also noted Jones' age was relevant "on both sides of the spectrum": "[h]is youth now [and] the age that he would be if he were to receive a sentence in which he could exit the [Department of Correction] alive." *Id.* at 76–77. Jones was six days shy of twenty-three years old when he committed these offenses. Counsel requested a sentence of sixty years for felony murder and ten years for each robbery, all to be served concurrently.

[43] The trial court considered the fact Jones was a high school graduate with some college credit a mitigator. The trial court also found a prolonged period of incarceration would be an undue hardship on his two children. And finally, the trial court found Jones' substance use issues were a mitigator. The trial court found Jones' criminal history was an aggravator—specifically, he has prior felony and misdemeanor convictions, an earlier placement in community corrections was revoked, and he was on probation when these crimes were committed. The court also found as "a substantial aggravator . . . the nature and circumstances of the offenses. Specifically, . . . there were nine victims in 15 minutes on May 30th, 2020, at a time in our city where there was social unrest. And this was mayhem after peaceful unrest." *Id.* at 85.

[44] The trial court sentenced Jones to sixty years for felony murder and thirteen years for each robbery conviction. The court ordered the sentences to be served consecutively, for a total sentence of 164 years in the Department of Correction.

Jones appeals his convictions and sentence. Additional facts will be added as necessary.

## 1. Jones waived any objection to amending the charges against him, but waiver notwithstanding, there was no error in allowing the amendment.

Jones first claims the trial court erred by granting the State's motion to amend the indictment to add the Eggers and Zandy counts. He claims the amendment affected his ability to present a defense and substantially changed his position by allowing evidence he claims would otherwise have been inadmissible. He also proactively asserts he did not waive this claim by failing to request a continuance after the trial court allowed the amendment.

As Jones anticipated, the State argues Jones waived this claim. A long line of cases originating with *Riley v. State*, 506 N.E.2d 476 (Ind. 1987), has held the failure to request a continuance after the trial court allows a pre-trial substantive amendment to the charging information over defendant's objection results in waiver of the issue on appeal. *See Wilson v. State*, 931 N.E.2d 914, 918 (Ind. Ct. App. 2010), *trans. denied*; *see also* I.C. § 35-34-1-5(d) (2014) ("Upon permitting such amendment, the court shall, upon motion by the defendant, order any continuance of the proceedings which may be necessary to accord the defendant adequate opportunity to prepare the defendant's defense."). Jones urges us not to follow this line of cases, arguing *Riley* was based on an earlier version of the statute and the plain language of the current statute does not require a defendant to ask for a continuance. We decline Jones' request to

ignore Supreme Court precedent. Although the statute has been amended since *Riley* was decided, the operative language remained the same. *Compare* I.C. § 35-34-1-5 (1983), *with* I.C. § 35-34-1-5 (2007). Jones did not request a continuance to allow an adequate opportunity to prepare a defense and has waived this issue for appellate review.

[48] Waiver notwithstanding, Jones would not prevail. An amendment to the charging information may be either a matter of form or substance." *See Erkins v. State*, 13 N.E.3d 400, 405 (Ind. 2014). An amendment is one of substance "only if it is essential to making a valid charge of the crime." *Id.* at 406 (quoting *Fajardo v. State*, 859 N.E.2d 1201, 1205 (Ind. 2007)). The amendment here is one of substance: an amendment that adds a new count "is patently one of substance as charg[ing] the commission of a separate crime . . . is unquestionably essential to making a valid charge of the crime." *Mays v. State*, 120 N.E.3d 1070, 1080 (Ind. Ct. App. 2019) (internal quotation omitted), *trans. denied.*

[49] An indictment or information may be amended in matters of substance "upon giving written notice to the defendant at any time . . . before the commencement of trial . . . if the amendment does not prejudice the substantial rights of the defendant." I.C. § 35-34-1-5(b)(2). A defendant's substantial rights "include a right to sufficient notice and an opportunity to be heard regarding the charge; and, if the amendment does not affect any particular defense or change the positions of either of the parties, it does not violate these rights." *Erkins*, 13 N.E.3d at 405 (quoting *Gomez v. State,* 907 N.E.2d 607, 611 (Ind. Ct.

App. 2009), *trans. denied*).  The defendant's substantial rights are not prejudiced if a defense under the original charges would be equally available after the amendment, and the defendant's evidence would apply equally to the information in either form.  *Gaby v. State*, 949 N.E.2d 870, 874 (Ind. Ct. App. 2011).  "Ultimately, the question is whether the defendant had a reasonable opportunity to prepare for and defend against the charges."  *Taylor v. State*, 86 N.E.3d 157, 163 (Ind. 2017) (quotation omitted).

[50]    Jones' substantial rights were not prejudiced by the amendment.  Jones was charged in the Zandy case in August 2020.  After the MR case was filed in June 2021, Jones requested the two cases be set at the same time even before the State filed its motion to join in August 2022.  Then the State's motion to join remained pending for nine months.  By the time the trial court denied that motion, Jones had deposed Zandy and Detective Brink in preparation for the Zandy case.  As for the Eggers count, at the time of the grand jury proceedings in the MR case, the State knew about the Eggers robbery but did not know Eggers' identity.  When Eggers reported the crime to police in June 2022, the State promptly informed Jones.  At the hearing on the State's motion to amend, the State said it had "conversations" with the defense, so they "had informal notice, if not formal notice" of the State's intent to add the Eggers count.  *Tr. Vol. 2* at 134.  The State also informed the court Jones had already deposed Eggers.  Jones had sufficient notice of the Zandy and Eggers offenses prior to the motion to amend and a reasonable opportunity to prepare a defense to those counts.

And the amendment did not affect the availability of any particular defense or change the positions of either party. With the original charges in the MR case, the State was already alleging a close-in-time series of robberies accomplished by escalating force. Jones' defense in the MR case was that there was insufficient evidence proving he was part of the group robbing people around Vermont and Talbott Streets that night. That defense applied equally to the Eggers count and remained viable after the amendment. And Jones was preparing a defense in the Zandy case which was scheduled to be heard at the same time.

Jones claims the amendment "allowed the State to present a large amount of evidence that would not otherwise have been admissible." *Appellant's Br.* at 29.[14] Jones cites no authority to support his assertion the evidence would have been inadmissible, but based on his arguments in the trial court, it is likely he is relying on Indiana Evidence Rule 404(b). Rule 404(b)(1) provides that generally, evidence of a crime, wrong, or other act is not admissible to "prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Simply stated, evidence is inadmissible under Rule 404(b) when its only apparent purpose is to prove the defendant is a person who commits crime. *Dumes v. State,* 718 N.E.2d 1171, 1175 (Ind. Ct. App. 1999). However, where relevant, evidence of other crimes

---

[14] Jones cites the Zandy robbery video, the BOLOs created from the video, the photo array Zandy signed, and the testimony of both Zandy and Eggers as evidence that "would not have been relevant or admissible without the amendments." *Id.*

may be admissible for purposes other than to show the defendant's character or propensity to commit the crime charged. *Id.* Simultaneously with the motion to amend, the State filed a notice of intent to offer this evidence as either intrinsic evidence or non-propensity evidence.

[53]    Rule 404(b) does not bar "evidence of uncharged criminal acts that are 'intrinsic' to the charged offense." *Lee v. State*, 689 N.E.2d 435, 439 (Ind. 1997). "Intrinsic" means "those offenses occurring at the same time and under the same circumstances as the crimes charged." *Kyle v. State*, 54 N.E.3d 439, 444 (Ind. Ct. App. 2016). Such "evidence of happenings near in time and place that complete the story of the crime is admissible even if it tends to establish the commission of other crimes not included among those being prosecuted." *Bennett v. State*, 5 N.E.3d 498, 509 (Ind. Ct. App. 2014), *trans. denied.* At the hearing on the motion to amend, the State noted the events "are so inextricably intertwined that there would be no clear-cut way for the jury to understand the story about what occurred on that evening without hearing about all of those events." *Tr. Vol. 2* at 149. The State also asserted the acts were admissible for a non-propensity reason, specifically a plan to rob people during the unrest. Jones has not shown evidence of the Zandy and Eggers robberies would have been inadmissible if the counts had not been added and accordingly, has not shown his rights were substantially prejudiced by the amendment.

## 2. The trial court did not abuse its discretion in admitting Facebook messages.

[54] Jones claims the trial court erred by admitting private Facebook messenger conversations that were not properly authenticated. Three sets of exhibits were introduced: one set with messages obtained from Jones' account, one with messages from Anderson's account, and one with messages from Shields' account. Jones challenges only the admission of messages from Anderson's and Shields' accounts, conceding his own records do not suffer from authentication problems. *See Appellant's Br.* at 31 n.1.

[55] At trial, Detective Smalley explained that in trying to identify suspects, a "big part of the investigative process is social media research." *Tr. Vol. 7* at 34. He described searching names and known associates in "any available social media." *Id.* When Detective Smalley identifies a relevant Facebook account, he submits a preservation request and Facebook "essentially freezes or saves a version of the information on the account as it exi[s]ts in that moment in time." *Id.* "[I]f later on I write a search warrant for records related to that account, I can reference the preservation request[.]" *Id.* In this case, Detective Smalley sent a preservation request and later a search warrant for the Facebook accounts of Jones, Anderson, and Shields.

[56]     The warrant for Anderson, signed July 24, 2020, sought records from the account identified by the following URL:[15] https://www.facebook.com/marcus.y.anderson.  The warrant also included a screenshot of the account's homepage, including a photo.  Facebook returned a Certificate of Authenticity of Domestic Records of Regularly Conducted Activity signed by the Custodian of Records and certifying it had received a warrant on July 27, 2020, and was responding with records "for the account with the identifier 100001308246632." *Ex. Vol. 1* at 192.[16]  And the warrant for Shields, signed August 20, 2020, sought information "under Facebook case number 5203731" for the account identified by the following URL: https://www.facebook.com/nakeyah.shields.1[.]" *Ex. Vol. 3* at 63.  The Certificate of Authenticity certified Facebook had received a warrant and was providing records "for the account with identifier 100012326103170." *Ex. Vol. 1* at 187.

[57]     For each account, Facebook returned "a zipped folder with a large amount of information[,] . . . really anything associated with the account." *Tr. Vol. 7* at 35.  Detective Smalley reviewed the records and located messages he felt were

---

[15] "URL" stands for "Uniform Resource Locator," and is the address of a unique resource on the internet. *What is a URL?*, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/Web_mechanics/What_is_a_URL (last visited December 17, 2024) [https://perma.cc/76HH-F2W8].

[16] "Facebook assigns each user a unique number to the account." *Tr. Vol. 7* at 35.  To illustrate the basis for the objections to Anderson's and Shields' records, the warrant for Jones' records sought records from "https://www.facebook.com/profile.php?id=100008034708544." *Ex. Vol. 3* at 91.  The Certificate of Authenticity certified it was providing records "for the account with the identifier 100008034708544." *Ex. Vol. 1* at 176.

relevant to the investigation. The State copied the pages containing those messages, redacted irrelevant messages, and offered them into evidence.

[58] When the State offered the Facebook exhibits, the trial court held a hearing outside the presence of the jury at which all three defendants made their objections to "all the Facebook materials [the State is] trying to enter." *Tr. Vol. 7* at 36.[17] Jones' counsel challenged the authentication of the evidence, specifically the "lack of proper identification between the certification and the warrant." *Id.* at 37. Anderson's counsel objected to his records because there was no identifier number referenced in the search warrant for Anderson's account, but the certification purported to authenticate an identifier number, so there was "no nexus shown between the records and the certification." *Id.* at 41. Shields' counsel objected on similar grounds, stating, "I would agree that there is no nexus." *Id.*

[59] The State responded to each defendant's specific objection, and then generally argued:

> The inclusion of the vanity name, the inclusion of a screenshot of the exact account record, the images that are contained on that as well as the identifying number of linking both the affidavit and

---

[17] Because of the way the trial court conducted the hearing, each attorney only made a specific objection to the introduction of their client's records, but it is clear from context they all objected to the introduction of the records of each defendant. For instance, Jones' counsel made his objection to Jones' records, and the trial court invited Anderson's counsel to make hers. Anderson's counsel said, "I would echo [Jones'] argument as to the authentication problems of Alijah Jones," and the trial court said, "I was asking you on behalf of Mr. Anderson. We're not going to take a break for each . . . lawyer." Anderson's counsel replied, "So . . . you're asking to my objection specifically as to Mr. Anderson's records, correct?" *Tr. Vol. 7* at 39–40.

the records.  I think that the records have been properly authenticated.  I think that the . . . Court can determine that based upon a review of them.

They are what they purport to be.  They are reliable, they should be admitted as certified business records.

*Tr. Vol. 7* at 50.  The trial court admitted the Facebook records of each defendant.

[60] We review a trial court's decision on the admission of evidence only for abuse of discretion.  *Hall v. State*, 177 N.E.3d 1183, 1193 (Ind. 2021).  "We will reverse only if the trial court's ruling was clearly against the logic and effect of the facts and circumstances before it and errors affect a party's substantial rights."  *Id.*

[61] To properly authenticate a piece of evidence as a condition precedent to its admissibility, the proponent is required to "produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Ind. Evidence Rule 901(a).  There are a variety of ways to authenticate an item of evidence, including "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances."  Evid. R. 901(b)(4).  Absolute proof of authenticity is not required; an item is admissible if the evidence establishes "a reasonable probability that the document is what it is claimed to be."  *Rogers v. State*, 130 N.E.3d 626, 629 (Ind. Ct. App. 2019).  Once a reasonable probability is shown, "any inconclusiveness of the evidence's connection with the events at issue goes

to evidential weight, not admissibility." *Richardson v. State*, 79 N.E.3d 958, 962 (Ind. Ct. App. 2017), *trans. denied.* Authentication of an exhibit can be established by either direct or circumstantial evidence. *Wisdom v. State*, 162 N.E.3d 489, 494 (Ind. Ct. App. 2020), *trans. denied*.

[62] "Due to the inherent anonymity of social media, the author of posts or other communications made through this medium can be difficult to confirm[.]" *Id.* at 494–95. In cases where the State seeks to establish the author of incriminating textual communications made through social media accounts, evidence of the account's owner is often necessary to authenticate those statements. *Id.* at 494. A proponent can verify a social media account's owner by providing distinctive characteristics unique to the account and the alleged owner. *See Richardson*, 79 N.E.3d at 963; Evid. R. 901(b)(4). In *Richardson*, we held a statement made in Facebook messages was not properly authenticated because the defendant did not present evidence the Facebook account belonged to the victim nor did he "present any other indicia of reliability establishing [the victim] as the author of the contested statement." 79 N.E.3d at 964.

[63] But here, the State did present "other indicia of reliability." Jones claims there is no nexus between the accounts identified in the search warrants by URL and the records Facebook certified by numeric identifier. The URL is a unique identifier in itself. The search warrant for Anderson's records also included a screenshot of the account's homepage, and the warrant for Shields' records included a Facebook case number, each of which could help Facebook identify the correct account. Detective Smalley testified to the procedure he uses to

identify and obtain Facebook records, including submitting a preservation request and referencing that request in a later search warrant.

[64]     Moreover, the records themselves establish a reasonable probability the records are what the State claims they are. Jones does not challenge the authentication of his own Facebook records. Those records show he, with a numeric identifier ending 08544, communicated with Nakeyah Shields, with a numeric identifier ending 03170. *See, e.g.*, *Ex. Vol. 1* at 177. Shields' numeric identifier in Jones' records is the same number as in the Facebook certification of Shields' records. *See id.* at 187. In turn, Shields' records show she communicated with Marcus Anderson, with a numeric identifier ending 46632, the same identifier as in the Facebook certification of Anderson's records. *See id.* at 188, 192. And, to close the circle, Anderson's records show he communicated with Jones' account, with a numeric identifier ending 08544. The contents of the messages include references to and screenshots of the BOLOs from the Zandy robbery.

[65]     The State presented distinctive characteristics linking Shields and Anderson to the Facebook accounts used as evidence at trial. Even if the evidence was not indisputable proof of account ownership, such proof was not required. *Rogers*, 130 N.E.3d at 629. Any lingering doubts about the authenticity of each account go to the evidentiary weight of the messages, not their admissibility. *See Richardson*, 79 N.E.3d at 963. The trial court's decision to admit this Facebook evidence was not clearly against the logic and effect of the facts and circumstances before it.

## 3. There was sufficient evidence of felony murder.

A person commits felony murder by killing someone while committing another felony. Jones contends there is insufficient evidence to support his conviction of felony murder because the State did not prove beyond a reasonable doubt he committed the underlying felony of robbery or attempted robbery.

A sufficiency-of-the-evidence claim warrants a "deferential standard of review in which we 'neither reweigh the evidence nor judge witness credibility[.]'" *Hancz-Barron v. State*, 235 N.E.3d 1237, 1244 (Ind. 2024) (quoting *Brantley v. State*, 91 N.E.3d 566, 570 (Ind. 2018), *cert. denied*). We apply this deferential standard of review on appeal because a criminal trial is "the main event at which a defendant's rights are to be determined." *Young v. State*, 198 N.E.3d 1172, 1176 (Ind. 2022) (quoting *McFarland v. Scott*, 512 U.S. 849, 859 (1994)).

We respect the jury's primacy to determine whether the State has met its burden of proof, and therefore consider only the evidence most favorable to the verdict together with all reasonable and logical inferences that may be drawn therefrom. *Id.* A verdict may be sustained on circumstantial evidence alone if that evidence supports a reasonable inference of guilt. *Lacey v. State*, 755 N.E.2d 576, 578 (Ind. 2001). It is "not necessary that the evidence 'overcome every reasonable hypothesis of innocence.'" *Sallee v. State*, 51 N.E.3d 130, 133 (Ind. 2016) (quoting *Moore v. State*, 652 N.E.2d 53, 55 (Ind. 1995)). A conviction must be affirmed unless "no reasonable fact-finder could find the

elements of the crime proven beyond a reasonable doubt." *Young*, 198 N.E.3d at 1176 (citation omitted).

[69] "A person who . . . kills another human being while committing or attempting to commit . . . robbery . . . commits murder, a felony." I.C. § 35-42-1-1(2). To obtain a conviction of felony murder, the State need not prove intent to kill, but only the intent to commit the underlying felony—in this case, robbery. *Luna v. State*, 758 N.E.2d 515, 517 (Ind. 2001). A person commits robbery if he knowingly or intentionally takes property from another person or from the presence of another person by using or threatening the use of force on any person or by putting any person in fear. I.C. § 35-42-5-1(a). "A person attempts to commit a crime when, acting with the culpability required for commission of the crime, the person engages in conduct that constitutes a substantial step toward commission of the crime." I.C. § 35-41-5-1(a). And a person is subject to conviction for felony murder based on accomplice liability for the underlying offense. *Luna*, 758 N.E.2d 517. "A person who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense[.]" I.C. § 35-41-2-4.

[70] There is no direct evidence of what happened between the time Beaty is seen in a surveillance video leaving his apartment building and when his body was discovered in the street less than ten minutes later. The State's case against Jones for felony murder relies entirely on circumstantial evidence. Jones acknowledges a conviction may be supported by inferences drawn from circumstantial evidence. *See Appellant's Br.* at 36–37. But he emphasizes the

inferences must be reasonable—that is, not based on "evidence which is uncertain or speculative or which raises merely a conjecture or possibility." *Vasquez v. State*, 741 N.E.2d 1214, 1216 (Ind. 2001) (citation omitted). Jones claims the State's argument that "[s]omething happened that [Beaty's] phone is not in his hands anymore" invited the jury to speculate and its reliance on Dr. Poulos' testimony that Beaty's injuries more likely came from an altercation than a fall supports only a possibility of a taking by force. *Appellant's Br.* at 41 (quoting *Tr. Vol. 7* at 149).

[71] As our Supreme Court has reminded:

> In a circumstantial case, no single piece of evidence in isolation—no "smoking gun"—is offered to persuade the jury to convict. Yet a jury may be convinced, beyond a reasonable doubt, by looking at "a web of facts in which no single strand may be dispositive." *Kriner v. State*, 699 N.E.2d 659, 664 (Ind. 1998). Indeed, the "evidence in the aggregate may point to guilt where individual elements of the State's case might not." *Id.*

*Young*, 198 N.E.3d at 1176.

[72] The "web of facts" here includes the group's late arrival downtown during an "unprecedented . . . volume of runs and reports" for fights, shots fired, and "[m]asses of people blocking the streets." *Tr. Vol. 3* at 224. The high-quality video of the Zandy robbery from which Murrell—and ultimately Jones, Anderson, and Shields—were identified as suspects shows the group were all wearing surgical gloves and at least one man was armed. Zandy, Eggers, Morris, and Thompson were all robbed of their cellphones, and one of the men

had hold of Bell's cellphone before running away. Although they did not take items from everyone they encountered, they tried to do so. Detective Smalley tracked the suspects' movements from multiple surveillance video sources to each crime scene, and ballistics evidence tied three of the scenes to each other. Eggers, Morris, and Fuentes identified the men from the BOLOs as the men who robbed them. Zandy identified Anderson in a photo array and at trial as one of her assailants, and Lewis identified one of the men from the BOLOs as Jones.

[73]     The suspects robbed multiple groups of people immediately before Beaty was shot and tried to rob Sunkara right after, all occurring close in time and space. As the crimes were described by the victims, the suspects became increasingly bold in their use of force with each robbery. The robberies of Morris, Bell, Thompson, Fuentes, and Mitchell place the suspects on Talbott Street mere minutes before Beaty's body was found. Shields admitted interacting with Beaty near the south end of Talbott Street and then hearing gunshots. Beaty's cellphone was found toward the north end of Talbott Street, some distance from his body which was facedown pointed to the south—the direction from which he had come. Dr. Poulos identified several blunt force injuries to Beaty's body, and posited they were more likely than not from a physical altercation. And Jones, Anderson, and Shields shared messages indicating a consciousness of guilt after the fact in the days after May 30.

[74]     In rejecting a defendant's claim that "the evidence necessarily left room for reasonable doubt[,]" our Supreme Court noted it cannot substitute its own

"weighing of the evidence for that of the jury. Nor will we divide and conquer the evidence by interpreting each piece individually in the defendant's favor, rather than considering the composite picture and drawing reasonable inferences in support of the verdict." *Young*, 198 N.E.3d at 1178–79. Here, although no "smoking gun"—direct evidence of the Beaty crime—was presented, we likewise cannot say a reasonable jury was unable to draw reasonable inferences from the circumstantial evidence presented to conclude Jones and his co-defendants had a plan to use the chaos downtown on May 30 as cover to rob people. That evidence supports a reasonable inference Jones was guilty of robbing or attempting to rob Beaty by using or threatening force on Talbott Street. Accordingly, we must affirm his conviction.

## 4. The trial court did not commit fundamental error in instructing the jury.

Jones next argues the final jury instruction for the felony murder count was erroneous because it omitted an element of the offense. He acknowledges he did not object to this instruction, but claims it was fundamental error for the trial court to give the instruction.

A party's failure to object to an alleged trial error results in waiver of that claim on appeal. *Batchelor v. State*, 119 N.E.3d 550, 556 (Ind. 2019). But a party can raise an otherwise waived issue through a showing of fundamental error. *See Mathews v. State*, 849 N.E.2d 578, 587 (Ind. 2006). The "fundamental error" exception to waiver is "extremely narrow, and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm

is substantial, and the resulting error denies the defendant fundamental due process." *Id.* The mere fact of prejudicial error is not enough to establish there was *fundamental* error. *Absher v. State*, 866 N.E.2d 350, 355 (Ind. Ct. App. 2007). Instead, the appellant "faces the heavy burden of showing that the alleged errors are so prejudicial to [their] rights as to 'make a fair trial impossible.'" *Ryan v. State*, 9 N.E.3d 663, 668 (Ind. 2014) (quoting *Benson v. State*, 762 N.E.2d 748, 756 (Ind. 2002)).

[77] In evaluating fundamental error, we must look at the alleged misconduct in the context of all that happened and all relevant information given to the jury—including evidence admitted at trial, closing argument, and jury instructions—to determine whether the error had such an undeniable and substantial effect on the jury's decision that a fair trial was impossible. *Id.* Jones can prevail only if the jury charge as a whole "was so misleading as to make a fair trial impossible or blatantly violate basic due process." *Knapp v. State*, 9 N.E.3d 1274, 1285 (Ind. 2014).

[78] To obtain a conviction for felony murder, "it was necessary to instruct the jury on the definition of robbery, in that it was necessary for the jury to find that a robbery in fact had been perpetrated before it could come to the conclusion that a felony murder had been committed." *Brownlow v. State,* 484 N.E.2d 560, 562 (Ind. 1985). Here, the trial court's final instruction on the felony murder charge against Jones instructed the jury the State had to prove Jones killed Beaty during a robbery or attempted robbery but failed to tell the jury the underlying

offense of robbery requires proof Jones used or threatened to use force. *See* I.C. § 35-42-5-1(a).

[79] A defendant is entitled to have the jury instructed on all elements of the charged offense. *Thomas v. State,* 827 N.E.2d 1131, 1134 (Ind. 2005); *see In re Winship,* 397 U.S. 358, 364 (1970). But an error in an instruction does not rise to the level of fundamental error where the issue was not a central issue at trial, *Winkleman v. State*, 22 N.E.3d 844, 850 (Ind. Ct. App. 2014), *trans. denied*, or if the other instructions, viewed as a whole, sufficiently inform the jury of the State's burden of proof, *Ramsey v. State*, 723 N.E.2d 869, 873 (Ind. 2000). Just as the trial court directed the jury "to consider all the instructions together," and to "not single out any certain sentence or any individual point or instruction and ignore the others," *Tr. Vol.* 3 at 172, we review jury instructions "as a whole and in reference to each other," and "error in a particular instruction will not result in reversal unless the entire jury charge misleads the jury as to the law in the case," *Knapp*, 9 N.E.3d at 1284–85 (citation omitted).

[80] In the preliminary instructions, the trial court read to the jury the charge of felony murder against Jones alleging he knowingly killed Beaty while committing or attempting to commit robbery, which is "to knowingly or intentionally take property from the person or presence of another person by use of force or by threatening the use of force or by putting any person in fear." *Tr. Vol. 3* at 178; *see Appellant's App. Vol. 2* at 32. The trial court also read the felony murder charges against Anderson and Shields, including the use or threat of force/fear language. In the final instructions, the trial court explained

the elements of each charge of robbery and attempted robbery against Jones—eight in all—and each time defined the crime of robbery and stated the State must have proved beyond a reasonable doubt that Jones knowingly or intentionally took or attempted to take property from a victim "by using or threatening the use of force" while armed with a deadly weapon. *Tr. Vol. 7* at 168–74.[18]  In addition, the trial court repeated the definition and the elements of robbery or attempted robbery eight times when instructing the jury on the charges against Anderson and seven times when instructing the jury on the charges against Shields.  And, during Shields' closing argument, her attorney read the felony murder count against Shields that defined robbery:

> [S]he is charged with . . . kill[ing] another human being . . . ,
> while committing or attempting to commit robbery.  That is to
> knowingly or intentionally take property from the presence or
> person of another person by use of force or threatening the use of
> force or by putting any person in fear.

*Id.* at 139.

[81]     Given this context, the jury instructions viewed as a whole made a clear and definite statement of the correct statutory elements.  The jury was sufficiently informed the State was required to prove beyond a reasonable doubt that Jones killed Beaty while knowingly or intentionally taking or attempting to take property from him by force or threat of force.  *See Walker v. State*, 621 N.E.2d

---

[18] The final instructions include only the element of force or threat of force and do not include placing the person in fear.  Jones does not make a separate argument about this omission.

627, 630–31 (Ind. 1993), *on reh'g*, 632 N.E.2d 723 (Ind. 1994) (holding no fundamental error where trial court did not instruct the jury on an element of robbery in trial for felony murder but did read the charging information which included the elements of the charged crime). The omission from the felony murder final instruction did not have such an undeniable and substantial effect on the jury's decision that a fair trial was impossible.

## 5. The trial court did not err in denying Jones' request for surrebuttal.

[82] Jones claims the trial court erred by denying his request for surrebuttal, asserting the State raised a new point or fact in its rebuttal closing argument.

[83] The Indiana Jury Rules, which "govern petit jury assembly, selection, and management in all courts of the State of Indiana," include the following rule about final arguments:

> If the parties argue the case to the jury, the party with the burden of going forward shall open and close the argument. The party which opens the argument must disclose in the opening all points relied on in the case. If, in the closing, the party which closes refers to any new point or fact not disclosed in the opening, the adverse party has the right to reply to the new point or fact. The adverse party's reply then closes the argument in the case.

Ind. Jury Rule 1, 27 (2007); *see also* I.C. § 35-37-2-2(4) (1985) ("[T]he prosecuting attorney shall disclose in the opening [closing argument] all the points relied on in the case, and if in the closing he refers to any new point or fact not disclosed in the opening, the defendant or his counsel may reply to that

point or fact, and that reply shall close the argument of the case.").  The conduct of final argument is within the trial court's discretion.  *Hughes v. State*, 508 N.E.2d 1289, 1299 (Ind. Ct. App. 1987), *trans. denied*.

[84]   Jones contends the State for the first time specified the property allegedly stolen from Beaty when it argued "Beaty's phone being on the ground was evidence that the phone had been taken from him during a robbery."  *Appellant's Br.* at 51–52.  The charging information did not identify any specific property that had allegedly been taken from Beaty.  In its closing argument, the State said:

> We see the escalation that happened during each one of these robberies.  Amy Zandy was told you're going to be okay baby girl.  She's not hurt.  She['s] scared. . . .
>
> Kim Eggers's, the next one, she gets beat down on the sidewalk. . . . The next one, [Thompson] and them behind the building, they're getting gut kicks and face kicks with shoes as they're lying on the ground[.]
>
> And the next one, Chris Beaty gets beat because the group escalates and then he's killed.

*Tr. Vol. 7* at 106–07.

[85]   Anderson then argued in his closing:

> [T]here's no evidence of any property taken from [Beaty].  His cell phone's north in the alley.  But again, there's no evidence that it was taken from him, that they took it from him.

> The evidence is consistent with perhaps there were shots, he ran
> and fell. He had his phone in his hand as he started to run, run
> and fell. No evidence that anyone struggled with him.

*Id.* at 117–18. Jones claimed the other victims may have been robbed, but Beaty had been killed, not robbed. *Id.* at 133 (characterizing the State's argument as "They ran up, they robbed one guy, they robbed [Mitchell] and [Fuentes], they killed Chris Beaty, and they took off, all in this one time, all in this one area."). Shields also argued there was no evidence Beaty was robbed. *See id.* at 139.

[86] On rebuttal—responding to all three defendants' closing arguments—the State argued:

> Something happened that [Beaty's] phone is not in his hands
> anymore. Every victim of the robbery at the end of [Talbott
> Street] said that they were trying to take their phones, standing
> over them, making them enter their passwords, trying to get into
> the phone. The phone is at the end of [Talbott Street] and
> Christopher Beaty has, as Dr. Poulos testified, injuries that are
> more likely to have come from an altercation than simply falling
> on the ground.

*Id.* at 149. Jones requested surrebuttal, asserting the State "contended that someone tried to take Christopher Beaty's phone and that its distance from his

body was evidence a robbery occurred. This was not an argument they advanced in their closing." *Id.* at 156. The trial court denied the request.[19]

[87] When the State's rebuttal is invited by comments made by defense counsel during closing arguments, the defense has no right to respond to the rebuttal. *Inman v. State*, 4 N.E.3d 190, 203 (Ind. 2014) (decided under Jury Rule 27); *Goodman v. State*, 588 N.E.2d 507, 508 (Ind. 1992) (decided under I.C. § 35-37-2-2(4)). Jones claims the defendants merely argued the State had not met its burden of proof and did not inject a new issue that would invite the State's comments on rebuttal.

[88] In its initial closing argument, the State characterized the crime against Beaty as the "next" crime in an escalating string of robberies, a crime spree that ended in Beaty's death. *Tr. Vol. 7* at 107. In addition to Jones and Shields generally arguing the State failed to prove a robbery, Anderson specifically challenged the State's proof of any particular property being taken by force, arguing the evidence was consistent with Beaty dropping his phone as he ran rather than a forceful taking. The State's comments—which comprised a relatively small portion of its rebuttal—were a response to statements made by defense counsel. The State pointed out the perpetrators had been taking or trying to take people's phones, Beaty's phone was not found with his body, and Dr. Poulos testified Beaty had injuries consistent with an altercation. This was a fair response to

---

[19] The trial court allowed Jones to make a record supporting his request, but not until after the trial court had given final instructions and the jury began deliberations.

the defense's points. The trial court did not abuse its discretion in denying Jones a second closing argument.[20]

## 6. Jones' sentence is not inappropriate.

[89] Finally, Jones asks us to revise his sentence. The Indiana Constitution authorizes this Court to review and revise a trial court's sentencing decision as provided by rule. Ind. Const. art. 7, § 6. Indiana Appellate Rule 7(B) provides we may revise a sentence authorized by statute if, "after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." The principal role of appellate review is to leaven the outliers, not to achieve a perceived correct sentence in each case. *Conley v. State*, 183 N.E.3d 276, 288 (Ind. 2022). Therefore, "we reserve our 7(B) authority for exceptional cases." *Faith v. State*, 131 N.E.3d 158, 160 (Ind. 2019) (per curiam).

[90] "[S]entencing is principally a discretionary function in which the trial court's judgment should receive considerable deference." *Cardwell v. State*, 895 N.E.2d 1219, 1222 (Ind. 2008). "Such deference should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's

---

[20] The State argues Jones waived this argument by not objecting during the State's rebuttal, citing *Jones v. State*, 825 N.E.2d 926, 932 (Ind. Ct. App. 2005), *trans. denied*. Jones asserts that case was wrongly decided and urges us not to follow it. Because the result is the same whether we follow *Jones* and find the issue waived or consider it on its merits, we decline to address whether *Jones* was wrongly decided.

character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015). The two prongs of 7(B) review are "separate inquires to ultimately be balanced in determining whether a sentence is inappropriate." *Lane v. State*, 232 N.E.3d 119, 126 (Ind. 2024) (quoting *Conner v. State*, 58 N.E.3d 215, 218 (Ind. Ct. App. 2016)). "[T]o the extent the evidence on one prong militates against relief, a claim based on the other prong must be all the stronger to justify relief." *Id.* at 127.

[91] The question "is not whether another sentence is more appropriate; rather, the question is whether the sentence imposed is inappropriate." *Helsley v. State*, 43 N.E.3d 225, 228 (Ind. 2015) (quoting *King v. State*, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008)) (emphasis omitted). Whether we regard a sentence as inappropriate "turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Cardwell*, 895 N.E.2d at 1224. The defendant bears the burden of persuading us a revised sentence is warranted. *See Hall*, 177 N.E.3d at 1197.

[92] Jones was convicted of felony murder—which carries a sentencing range of forty-five to sixty-five years, with an advisory term of fifty-five years—and eight Level 3 felonies—which each carry a sentencing range of three to sixteen years, with an advisory sentence of nine years. I.C. §§ 35-50-2-3, -5(b). The trial court sentenced him to sixty years for felony murder, thirteen years for each robbery or attempted robbery conviction, and ordered the sentences to be served

consecutively, for a total sentence of 164 years. The individual sentences were above the advisory, but below the maximum authorized sentences.

[93] As for the nature of the offenses, Jones and his companions arrived in downtown Indianapolis after chaos had taken hold. They could have stayed away. Instead, they exploited law enforcement's focus on civil unrest around the city to commit multiple crimes in a startlingly short amount of time. *See Tr. Vol. 8* at 85 (trial court noting "there were nine victims in 15 minutes on May 30th, 2020"). They demonstrated complete disregard for the safety of others, gratuitously using force to express displeasure with their victims' failure to comply with their commands and ultimately shooting Beaty from behind.

[94] Jones acknowledges consecutive sentences are warranted when multiple victims suffer separate harms. *See Appellant's Br.* at 57. But he argues consecutive sentences totaling sixty-five years for the five robberies and attempted robberies that occurred at more or less the same time (Bell, Thompson, Morris, Fuentes, and Mitchell) "are the equivalent of the maximum sentence for murder" and inappropriate under the circumstances of these offenses. *Id.*

[95] Jones' crimes were crimes of violence, for which the legislature explicitly allows consecutive sentences even if they are a "connected series of offenses that are closely related in time, place, and circumstance." I.C. § 35-50-1-2 (2019). "Whether the counts involve one or multiple victims is highly relevant to the decision to impose consecutive sentences if for no other reason than to preserve potential deterrent of subsequent offenses." *Cardwell*, 895 N.E.2d at 1225.

Consecutive sentences also acknowledge the damage caused to each individual victim. *See Serino v. State,* 798 N.E.2d 852, 857 (Ind. 2003). In "separating the people we're mad at from the people we're afraid of," Jones' senseless offenses of opportunity put him squarely on the side of being a person we're afraid of. *Lane*, 232 N.E.3d at 124–25 (internal quotations omitted). The trial court's imposition of consecutive sentences for the robberies does not render Jones' sentence inappropriate.

[96] Jones has not offered compelling evidence portraying the nature of his offenses in a positive light; therefore, to prevail he must make an even stronger showing regarding the nature of his character. *See id*. at 127. He highlights his difficult childhood, strong family support, ongoing contact with his children, and good conduct while incarcerated awaiting trial. We commend Jones for his good behavior in jail and for maintaining a relationship with his children. But we cannot say Jones has demonstrated substantial virtuous traits or positive attributes that would offset the nature of the offenses he committed. *See Stephenson*, 29 N.E.3d at 122. Jones' criminal history, albeit brief, includes two felony convictions for robbery, revocation of a community corrections placement within a matter of months, and the commission of these offenses while on probation for a theft conviction. Jones' previous convictions of robbery are especially relevant here. *See Webb v. State*, 149 N.E.3d 1234, 1242 (Ind. Ct. App. 2020) (noting the significance of a defendant's criminal history "varies based on the gravity, nature, and number of prior offenses in relation to the current offense") (citation omitted). And his overall criminal history shows

a continuing disregard for the rule of law and for the peace and property of other people, which reflects poorly on his character. *See Zamilpa v. State*, 229 N.E.3d 1079, 1090 (Ind. Ct. App. 2024) (explaining even a minor criminal history reflects poorly on a defendant's character).

[97] Jones essentially seeks to have this Court substitute its judgment for the trial court's, which we will not do. *See Stephenson*, 29 N.E.3d at 122. Jones' sentence is not an outlier requiring correction.

## Conclusion

[98] Jones waived any error in the amendment of his charges, but regardless, there was no error. The trial court did not err in admitting social media evidence or denying Jones' request for a surrebuttal argument. The trial court did not commit fundamental error in instructing the jury on the elements of felony murder. There was sufficient evidence supporting Jones' conviction of felony murder and his sentence is not inappropriate.

[99] Affirmed.

May, J., and Vaidik, J., concur.

ATTORNEY FOR APPELLANT

Megan Shipley
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General

Samuel J. Dayton
Deputy Attorney General
Indianapolis, Indiana